CENTRAL BOCA CHICA, INC., demandante y apelada, *v.* TESORERO DE PUERTO RICO, demandado y apelante. CENTRAL BOCA CHICA, INC., demandante y apelante, *v.* TESORERO DE PUERTO RICO, demandado y apelado.

Núms. 7786 y 7917.—*Sometidos:* Enero 13, 1939. *Resueltos:* Marzo 8, 1939.

*V. Zayas Pizarro,* abogado de la demandante, apelada y apelante; *Hon. Procurador General B. Fernández García* y *V. Palés Matos, Subprocurador,* abogados del demandado, apelante y apelado.

EL JUEZ ASOCIADO SEÑOR DE JESÚS emitió la opinión del tribunal.

La Central Boca Chica, Inc., corporación doméstica dedicada al cultivo y compra de cañas y fabricación de azúcar, deseando asegurar sus obreros a los efectos de la Ley número 85 de 14 de mayo de 1928 (Leyes de ese año, pág. 631), el 25 de octubre de 1932 solicitó de la Comisión Industrial que le expidiese la póliza correspondiente. Convino con el tasador asegurador del Negociado de Compensaciones a Obreros, Sr. José G. Salgado, que los efectos de la póliza se retrotraerían al 14 del citado mes y que la cuota o prima se pagaría

en pagos mensuales a partir del 31 de octubre de 1932. Expidió Salgado la póliza solicitada, que llevó el número 8294, y la entregó a la asegurada. En la fecha estipulada, remitió la demandante a la Comisión Industrial el primer pago del premio, montante a $990. Lo rechazó el Tesorero de Puerto Rico, alegando que la asegurada debía pagar la cuota por semestres adelantados. No pagó la demandante en la forma indicada por el Tesorero, aunque alega que siempre estuvo dispuesta a satisfacer el premio mediante pagos mensuales. Así continuaron las cosas hasta que el 31 de abril de 1933 el Tesorero demandado requirió de la demandante el pago total del premio, con intereses y recargos. Sostenía el Tesorero que no habiendo pagado sus cuotas por semestres adelantados, el *status* de la demandante era el de patrono no asegurado, y en su consecuencia no sólo exigía el total del pago de la póliza, ascendente a $6,016.80, recargos y apremios incluídos, si que también, como patrono no asegurado, debería pagar *todas las indemnizaciones concedidas a sus obreros en el período comprendido entre el 14 de octubre de 1932 y el 13 de abril de 1933.* Se embargaron bienes de la demandante para asegurar dichos pagos y el 29 de enero de 1934 pagó bajo protesta la cantidad de $6,016.80, por concepto de cuota, apremios y recargos. Posteriormente pagó también bajo protesta la liquidación de los accidentes, que ascendió a la suma de $10,086.50.

Sosteniendo la demandante que el pago de $6,016.80 verificado el 29 de enero de 1934 la había convertido en patrono asegurado y que por consiguiente era ilegal el cobro de los $10,086.50 antes aludidos, o que de no considerársele como patrono asegurado debería devolvérsele la cantidad de $6,016.80 cobrádale por concepto de cuota o prima, instó este pleito en la Corte de Distrito de Ponce el 2 de octubre de 1934, siendo enmendada la demanda el 11 de septiembre de 1935, con la súplica anteriormente indicada.

Después de radicada la titulada "Segunda Demanda Enmendada Complementaria", el Tesorero de Puerto Rico pre-

sentó a la demandante, por conducto del Colector de Rentas Internas de Ponce, una liquidación adicional por la suma de $708.79, procedente de la liquidación de reclamaciones por accidentes del trabajo de varios obreros de la demandante durante el período comprendido entre el 14 de octubre de 1932 y el 13 de abril de 1933, suma que incluye $701.79 por concepto de gastos de liquidación y $7.00 que representan apremio y gastos de embargo. La anterior liquidación de $708.79 fué pagada bajo protesta el 11 de septiembre de 1935 y motivó la radicación de la titulada "Demanda Complementaria Enmendada" (T. de A., pág. 12).

A virtud de este último pago, la cantidad reclamada por la demandante por concepto de indemnizaciones mientras alegaba ser un patrono asegurado, asciende a $10,795.29.

Presentó el demandado excepciones previas que fueron desestimadas, y finalmente la contestación a la "Demanda Complementaria Enmendada" y a la "Segunda Demanda Enmendada Complementaria." Admite el demandado los pagos que alega haber hecho la demandante, y que el demandado rechazó todos los ofrecimientos de la demandante para pagar la cuota correspondiente a la póliza número 8294 mediante pagos mensuales; que el 13 de abril de 1933 el demandado también se negó a aceptar de la demandante el pago íntegro de dicha cuota con intereses y recargos; que se trabaron los embargos mencionados por la demandante, y finalmente, en la contestación a la "Segunda Demanda Enmendada Complementaria", expone el demandado su posición en los siguientes términos:

". . . que en 25 de octubre de 1932 la demandante solicitó y obtuvo del Tasador Asegurador de la Comisión Industrial, Sr. José G. Salgado, la póliza serie Núm. 8294 para cubrir el riesgo de sus obreros durante el año fiscal de 1932–33, conviniendo con dicho empleado que la cuota se pagaría en plazos mensuales, comenzando el 31 de octubre de 1932; que el Tasador Asegurador, José G. Salgado, no tenía autorización para aceptar arreglos ni entrar en convenios de esta naturaleza con la demandante y que por tal motivo el demandado se negó a aceptar dicha póliza y la devolvió a la demandante con

fecha octubre 27 de 1932; que por carta de noviembre 5 de 1932, el Jefe del Negociado de Compensaciones a Obreros, por orden del Tesorero de Puerto Rico, devolvió a la demandante el cheque Núm. 7576, expedido por ésta a favor del Tesorero de Puerto Rico por la suma de $990.00, importe del primer plazo de la cuota correspondiente a la indicada póliza Núm. 8294; que el convenio para pagar el importe de dicha cuota en plazos mensuales se llevó a efecto con el referido Tasador Asegurador y nunca con la Comisión Industrial o con el Tesorero de Puerto Rico y que durante todo el mencionado período el *status* de la demandante era el de patrono no asegurado, el cual *status* continuó hasta el 13 de abril de 1933, en que habiendo pasado la Central Boca Chica a poder de la Sucesión Serrallés, solicitó, bajo su nueva administración, asegurarse en el Fondo del Estado hasta junio 30 del mencionado año, lo que llevó a efecto pagando la prima que le fué impuesta.'' (T. de A. pág. 29–30.)

Fué el caso a juicio, y el 26 de abril del año pasado la Corte de Distrito de Ponce dictó la siguiente sentencia:

''La Corte, por los fundamentos consignados en su opinión emitida en el día de hoy y unida al récord, por la presente dicta sentencia declarando, como declara, con lugar, en parte, la demanda, y en su consecuencia, condenando, como condena, al demandado Hon. Rafael Sancho Bonet, en su carácter de Tesorero de Puerto Rico, a reintegrar a la actual demandante Wirshing & Co., S. en C., como subrogada en todos los derechos y acciones de la primitiva demandante Central Boca Chica, Inc., la suma de seis mil diez y seis dólares con setenta y nueve centavos ($6,016.79), que fué pagada bajo protesta por la Central Boca Chica, Inc., en enero 29 de 1934, según el recibo núm. 334, firmado por el Colector de Rentas Internas de Ponce, más intereses de dicha suma a razón del seis por ciento anual, desde la radicación de la demanda primitiva en esta Corte, o sea desde el día 2 de octubre de 1934, todo ello sin especial condenación de costas.'' (T. de A., pág. 46.)

Contra la anterior sentencia una y otra parte interpusieron recurso de apelación.

La demandante imputó a la corte sentenciadora los siguientes errores:

''*Primero:* La Corte de Distrito de Ponce cometió error de hecho y de derecho al declarar que la Central Bocachica, Incorporada, no era un patrono asegurado por el período transcurrido· desde octubre

14 de 1932 a abril 13 de 1933, y que por tanto, la Central Bocachica, Inc. venía obligada a pagar el importe de las indemnizaciones y gastos de liquidación de los mismos, por accidentes ocurridos a obreros de dicha demandante, durante el indicado período de 14 de octubre de 1932 a 13 de abril de 1933.

"*Segundo:* La Corte de Distrito de Ponce cometió error al no declarar que la póliza núm. 8294 expedida a favor de la Central Bocachica, Inc., por el Sr. José G. Salgado, en representación del Fondo de Seguro del Estado, fué debidamente expedida y tuvo la virtualidad de convertir inmediatamente después de su expedición a dicha Central Bocachica, Inc., en un patrono asegurado con el Fondo del Estado, por el referido período de 14 de octubre de 1932 a 13 de abril de 1933.

"*Tercero:* La Corte de Distrito de Ponce cometió error al no declarar que aun en el caso de que la póliza número 8294 expedida a favor de la Central Bocachica, Inc., no hubiera sido expedida en forma y por el funcionario debidamente autorizado para ello, sin embargo, al insistir el demandado Tesorero de Puerto Rico en el cobro de la cuota por concepto de prima de seguro con el Fondo del Estado, y el pago de la misma por parte de la demandante en 29 de enero de 1934 y en una fecha cuando ya había transcurrido el término del riesgo, pero con anterioridad al requerimiento de pago de las indemnizaciones y gastos de liquidación de los accidentes ocurridos durante dicho período, constituye una ratificación y confirmación incondicional de tal póliza, la cual retrotrajo en forma igualmente incondicional sus efectos a la fecha en que la misma fué expedida, y que por tanto, y en último análisis, la demandante no venía obligada en forma alguna a pagar las compensaciones y gastos de liquidación de las mismas que le fueron cobrados y pagó bajo protesta al Tesorero de Puerto Rico, bajo la supuesta teoría de que dicha Central Bocachica, Inc., era un patrono no asegurado.

"*Cuarto:* La Corte de Distrito de Ponce cometió grave error al dictar una sentencia contraria a la ley y a los hechos de este caso."

El demandado señaló un solo error, a saber:

"1. Erró la Corte de Distrito de Ponce al resolver que: 'un patrono *no asegurado* no tiene que pagar al Tesorero de Puerto Rico, además de pagar a los obreros las indemnizaciones por accidentes ocurridos a éstos durante el período en que dicho patrono no estaba asegurado, la cuota o prima de una póliza de seguros que cubra el mismo período de tiempo en que el patrono no estaba asegurado y en el cual ocurrieron los accidentes cuyo importe pagó.' "

Siendo tan íntima la relación entre los errores señalados por las dos partes, nos proponemos considerar ambos recursos conjuntamente, empezando por el establecido por la demandante.

■■■■ ¿Cometió error la corte sentenciadora al declarar que la demandante no era un patrono asegurado durante el período comprendido entre el 14 de octubre de 1932 y el 13 de abril de 1933?

Gran parte de su alegato lo dedica la demandante a tratar de demostrar que era ella un patrono asegurado durante el mencionado período.

La ley aplicable a este caso es la número 85, de 14 de mayo de 1928 (Leyes de ese año, pág. 631), cuya sección 40 en lo pertinente dice así:

"El seguro de cada patrono por el Estado, *comenzará a regir* inmediatamente *después de que haya sido archivada en las oficinas de la Comisión su nómina o estado por duplicado, acompañada del importe de la cuota* que corresponda al tanto por ciento de los jornales declarados en dicho estado de acuerdo con los tipos fijados por el Tesorero; . . ." (Pág.681.)

El concurso de dos requisitos exigía la Ley número 85 para que comenzara a regir el seguro por el Estado: (*a*) Que se archivase en las oficinas de la Comisión la nómina o estado por duplicado, expresando el número de obreros empleados por el patrono, clase de ocupaciones de dichos obreros, y cantidad de jornales pagados a los mismos durante el año económico anterior; y (*b*) *acompañar dicho estado por duplicado del importe de la cuota.*

Consecuente con el principio antes enunciado, el legislador lo reprodujo aun con más claridad en la sección 27 de la Ley núm. 45 de 1935 (Leyes de ese año, pág. 251, 311), que en lo pertinente dice así:

"El seguro de cada patrono por el Estado comenzará a regir inmediatamente después de que haya sido archivada en las oficinas del Administrador del Fondo del Estado su nómina o estado por duplicado, *acompañado del importe de la cuota que corresponda al tanto*

*por ciento de los jornales declarados en dicho estado, de cuerdo con
los tipos fijados por el Administrador; Disponiéndose, que cualquier
accidente que ocurra antes de verificarse el pago, será considerado
como un caso de patrono no asegurado a menos que el patrono veri-
fique el pago dentro del término fijado por el Administrador del
Fondo del Estado, en los cuales casos el seguro empezará a regir
desde la fecha en que el patrono archivó la nómina o estado en la
oficina del Administrador.*

"Al recibir el pago del patrono, el Administrador del Fondo del
Estado remitirá a dicho patrono el recibo de tal pago, el cual será
prima facie prueba de dicho pago de las primas y del cumplimiento
de dicho patrono con las disposiciones de esta Ley. *Mientras no se
haya hecho este pago por el patrono, dicho patrono no tendrá derecho
a las inmunidades provistas por esta Ley* con respecto a las lesiones,
enfermedades o muertes que pudieran ocurrir a los obreros o emplea-
dos de tal patrono durante el período que cubre el pago de dichas
primas, y los obreros o empleados de dicho patrono no tendrán de-
recho a los beneficios que se concedan por esta Ley al sufrir tales le-
siones, enfermedades o muerte; *pero tendrán derecho a entablar con-
tra el patrono aquellas reclamaciones de acuerdo con el procedimiento
fijado en casos de patronos no asegurados."* (Bastardillas nuestras.)

Y en la sección 25 de la citada ley de 1935, vuelve el legis-
lador a expresar:

"Si un patrono dejare de pagar el total de las cuotas que le fueran
impuestas legalmente dentro del término que le señalare el Adminis-
trador, éste podrá concederle una prórroga de treinta (30) días para
que el patrono efectúe el pago, y *dicho pago será un requisito indis-
pensable para que el Administrador pueda darle efectividad a cual-
quier póliza de seguro."* (Bastardillas nuestras.)

Tratando de demostrar que el pago de la cuota al remi-
tir el "estado por duplicado" no es indispensable para la
vigencia de la póliza, arguye la demandante:

"Y si la intención de la Legislatura hubiera sido el privar del
seguro con el Fondo del Estado a aquéllos que no hubieran pagado
anticipadamente la cuota, ¿por qué no haberlo consignado claramente
como lo hizo en la Ley derogatoria número 40 de 1935? La inten-
ción legislativa se colige precisamente por ese hecho, y el adicional de
que para el cobro de la cuota se provee el remedio adecuado, pago, que
dicho sea de paso, cumplidamente efectuó la aquí apelante al Tesorero

432

de Puerto Rico, según aparece de los recibos transcritos a las páginas 26 y 27 de la Transcripción de Evidencia en este caso, tan pronto el referido funcionario trabó embargo sobre los bienes de dicha apelante de acuerdo con la ley.'' (Alegato, pág. 31.)

Es éste un argumento que no resiste el más ligero análisis. Las reglas de hermenéutica legal no son arbitrarias o caprichosas. Todas descansan en sanos principios de lógica. ¿Qué base tenemos para inferir que porque una ley posterior sea más explícita en la exposición de un precepto que otra anterior por ella derogada, el propósito legislativo no sea el mismo en una y otra ley? Precisamente la posibilidad de ser mal interpretado o el propósito de disipar las dudas que pudieran surgir en el lenguaje anteriormente usado y no el que su criterio fuese distinto del anteriormente expresado pudo inducirlo a ser más explícito en la nueva ley. A este respecto se dice en el artículo ''Estatutos e Interpretación Estatutaria,'' de Charles C. Moore, que aparece en 1 Fed. Stat. Ann. 8, 42:

''El hecho de que la Asamblea Legislativa pudiera haberse expresado de manera más apropiada o más directa, no autoriza a los tribunales para menospreciar el sentido natural del lenguaje usado por el legislador.''

La sección 40 de la Ley número 85 de 1928 anteriormente transcrita, expresa con perfecta claridad la necesidad de que se acompañe el importe de la cuota al ''estado por duplicado'' para que empiece a regir el seguro por el Estado.

La demandante no cumplió con ese requisito. Suministró al tasador asegurador el estado que exige la ley y al expedirse la póliza no envió el importe de la cuota correspondiente, sino que se atuvo al convenio celebrado con dicho funcionario. ¿Tenía facultades el tasador asegurador para variar la forma de pago de la póliza? La ley no se las daba, y si la ley expresamente prescribía que el ''importe de la cuota'' debería acompañarse al ''Estado por duplicado'' —para que el seguro comenzara a regir, ni el tasador asegurador ni el Tesorero mismo podían pasar por encima del

precepto expreso de la ley y aceptar pagos parciales. Los funcionarios públicos sólo obligan al Estado cuando actúan dentro del radio de las facultades que les confiere la ley. *Jeems Bayou Fishing, etc. Club* v. *U. S.*, 260 U. S. 561, 67 L. ed. 402; *Citizens' Bank* v. *Seminole County Board of Education*, 170 Ga. 654, 153 S.E. 768; *Kuhn* v. *Commonwealth*, 291 Pa. 497, 140 A. 527.

En el caso de *Kuhn* v. *Commonwealth*, 140 A. 527, 529, la Corte Suprema de Pennsylvania, resolviendo que los actos de los empleados o funcionarios no obligan al Estado a menos que estén debidamente autorizados por la ley para realizarlos, dijo lo siguiente:

"Además, la Junta de Comisionados de Caza y Pesca en ningún momento confirió autoridad alguna al Superintendente de Imprenta y Encuadernación para decidir cómo deberían prepararse, o que fueran impresas, las tarjetas de licencia de cazadores, y de esta falta de autoridad el demandante venía obligado a tomar conocimiento. *Union Paving Co.* v. *Phila.*, 263 Pa. 577, 107 A. 370; *Moore* v. *Luzerne County*, 262 Pa. 216, 105 A. 94; *Hague* v. *City of Philadelphia*, 48 Pa. 527, 22 R.C.L. 459; *Sutton* v. *U. S.*, 256 U. S. 575, 41 S. Ct. 563, 65 L. ed. 1099, 14 A.L.R. 403; *Whiteside* v. *U. S.*, 93 U. S. 247, 12 S. Ct. 10, 23 L. ed. 882. Un municipio sólo está obligado por los actos autorizados de sus agentes. *Shields* v. *Hitchman*, 251 Pa. 455, 96 A. 1039; *Consolidated Beef Co.* v. *Phila.*, 245 Pa. 268; 91 A. 367; *Bartholomew* v. *Lehigh County*, 148 Pa. 82, 23 A. 1122; *York Gazette Co.* v. *York County*, 25 Pa. Supper Ct. 517."

Refiriéndose a la defensa de *estoppel* interpuesta por los demandados, la Corte Suprema de Estados Unidos ha dicho:

"Con respecto a este punto, basta decir que los Estados Unidos no están obligados ni impedidos (*estopped*) por actos de sus funcionarios o agentes al entrar en arreglos o celebrar convenios para hacer o conseguir que se haga lo que la ley no sanciona o permite. *Lee* v. *Munroe*, 7 Cranch, 366; *Filor* v. *U. S.*, 9 Wall. 45, 49; *Hart* v. *U. S.*, 95 U. S. 316; *Pine River Logging Co.* v. *U. S.*, 186 U. S. 279, 291." (*Utah Power & Light Co.* v. *U. S.*, 243 U. S. 389, 409.)

█ La demandante, al tratar de demostrar que el pago de la cuota no es una condición precedente a la existencia del

seguro por el Estado, invoca aquella parte de la sección 38 de la referida Ley número 85 de 1928 que dice así:

"Al patrono que no pagare el total de las cuotas que le fueren legalmente impuestas, dentro del plazo fijado por el Tesorero, se le concederán treinta (30) días de gracia y si vencido este término el patrono no pagare, el Tesorero de Puerto Rico, sin excusa ni dilación alguna, trabará embargo sobre cualesquiera bienes del patrono y procederá al cobro de la cuota adeudada como si del cobro de la contribución sobre la propiedad se tratare; *Disponiéndose,* que el Tesorero de Puerto Rico podrá cobrar recargos por cada mes o fracción del mismo, en que las cuotas permanezcan sin pagarse a razón del uno (1) por ciento mensual; *Y Disponiéndose, además,* que el Tesorero de Puerto Rico queda facultado para utilizar los servicios de los funcionarios y empleados de la Comisión, para ayudar a las gestiones del cobro de las cuotas y las tramitaciones de los embargos que procedieren."

La disposición transcrita no está en conflicto con la sección 40, que determina cuándo empieza a regir el seguro. La parte de la sección 38 anteriormente transcrita no hace otra cosa que proporcionar un remedio rápido al Tesorero para hacer efectivo el cobro de las cuotas; pero no implica que el seguro está en vigor por el solo hecho de radicar el "estado por duplicado", especialmente cuando la sección 40 exige el concurso de ambos requisitos: la presentación del "estado por duplicado" y el pago de la cuota.

■■ Ya hemos visto que la póliza no tuvo efecto legal alguno al ser expedida, porque el funcionario que la extendió, aunque autorizado para ello, no lo estaba para convenir en una forma de pago distinta de la prescrita por la ley, habiéndose rechazado los pagos parciales ofrecidos por la demandante. Alega ésta, sin embargo, que en el supuesto de que la póliza no hubiera sido válida originalmente, quedó ratificada por el Tesorero al exigir y obtener después el pago total de la cuota.

Para que exista confirmación o ratificación es necesario que expresa o implícitamente se manifieste la voluntad de convalidar el contrato por aquél que lo confirma o ratifica.

Tratando de la confirmación de los contratos, prescribe el artículo 1263 del Código Civil (edición 1930):

"Art. 1263. La confirmación puede hacerse expresa o tácitamente. Se entenderá que hay confirmación tácita cuando con conocimiento de la causa de nulidad y habiendo ésta cesado, el que tuviere derecho a invocarla ejecutase un acto que implique necesariamente la voluntad de renunciarla."

Comentando el artículo 1311 del Código Civil español, igual al 1263 del nuestro, dice Manresa:

"*Confirmación expresa y tácita.—Pluralidad de defectos.*—No está sujeta a fórmulas sacramentales, ni siquiera a forma especial, la confirmación; puede ser como lo dice la ley: expresa o tácita. La primera no está definida en aquélla, sin duda por lo claro de su concepto, y deberá reputarse que hay tal confirmación expresa, de acuerdo con el significado de esta palabra y conforme a lo que en general dicen otros códigos, cuando se hace referencia al contrato antes celebrado, se mencione el defecto de que adolece y se declare la voluntad de convalidarlo, o, lo que a ello equivale, se consigne la renuncia de la acción para reclamar la nulidad que de aquél se derivaba.

"Pudiendo ser nulo un contrato por diferentes motivos, cabe que concurran dos o más de éstos a determinar la nulidad, verbigracia, la violencia y el error, y que sea confirmado uno solo, la primera, en cuyo caso, desconociéndose el otro vicio de nulidad, no quedará extinguida la acción que de él se deriva y que tiene realidad y ejercicio independiente de la renunciada.

"En la confirmación tácita no expresándose los vicios de nulidad, parece lógico suponer que la confirmación es total, siempre que fueren conocidos los vicios todos de la parte que ejecutó el acto que revela el propósito de convalidar el contrato.

"Cuáles sean esos actos, o, lo que es igual, las manifestaciones de confirmación tácita, no puede determinarse *a priori,* como tampoco lo determina la ley, cuya fundada amplitud se opone también a que se limite y reduzca a casos preconcebidos la regla, quedando, por tanto, a la apreciación judicial la del propósito de renuncia que envuelva el acto ejecutado. Por eso, y ocupándonos separadamente de dos formas, que pueden ser usuales, de confirmación tácita, una de ellas mencionada expresamente por leyes extranjeras al tratar de esta materia, recogemos desde luego la doctrina formulada por la jurisprudencia en sentencia de 7 de mayo de 1897 acerca de otro de

los casos más indudables de confirmación tácita, declarando que 'no puede menos de considerarse ratificado un contrato cuando la persona que ha de ratificarlo ejercita en juicio las acciones creadas a su favor en virtud del mismo contrato'; doctrina que, formulada para la ratificación, es aplicable a la confirmación en general, siempre que haya conocimiento por parte del interesado de los vicios de nulidad.'' (Manresa, Comentarios al Código Civil, tomo 8, pág. 805 a 807.)

¿Se manifestó en algún momento la voluntad del Tesorero de ratificar el contrato celebrado por el tasador asegurador? El *exhibit D* de la demandante y sus propias alegaciones demuestran lo contrario. Dicho *exhibit D,* que es una carta escrita por el Tesorero J. W. Blanco, dirigida a la demandante el 16 de mayo de 1933, y que aparece en la página 139 de la transcripción de evidencia, en sus dos últimos párrafos dice así:

"Según las disposiciones de la ley, tal como ésta ha sido interpretada por el Hon. Procurador General de Puerto Rico, esta oficina está obligada y va a imponerle las cuotas por el período de tiempo que no estuvieron asegurados en alguna de las formas que determina la ley, y al efecto, por conducto del Colector de Rentas Internas de esa ciudad, enviará el recibo por dicha cantidad de $5,622.23, el cual esperamos manden a pagar a la mayor brevedad para evitarse la acumulación de recargos.

"*Deseo recordarles nuevamente que el pago de esta cantidad, que constituye su responsabilidad de patrono no asegurado, no les exime de su obligación de pagar los accidentes durante el tiempo que no estuvieron debidamente asegurados de acuerdo con la Ley.*"

Véase también la alegación cuarta de la segunda demanda enmendada complementaria. (T. de A., pág. 6.)

No pudo expresar el Tesorero de manera más inequívoca su intención de no ratificar la póliza, es decir, convalidarla con efecto retroactivo a la fecha en que la expidió el tasador asegurador. Así lo comprendió la demandante, y al pagar la cuota, lo hizo bajo protesta, demostrando de este modo su inconformidad con la opinión del Tesorero al efecto de que venía obligada a pagar las indemnizaciones más la cuota.

Lo expuesto nos lleva a la conclusión de que la póliza originalmente expedida por el tasador asegurador no tuvo efecto legal alguno y que el pago verificado por la demandante el 29 de enero de 1934, o sea cerca de un año después de vencido el término por el cual se solicitaba la póliza, tampoco tuvo el efecto de convalidar o ratificar la expresada póliza, puesto que, como hemos visto, la voluntad manifiesta del Tesorero al recibir el pago fué la de que la demandante quedaría siempre como un patrono no asegurado durante el período en que dejó de pagar la póliza, que fué la totalidad del período comprendido entre el 14 de octubre de 1932 y el 13 de abril siguiente.

A nuestro juicio, no cometió error alguno la corte sentenciadora al declarar que la demandante no fué un patrono asegurado durante el período comprendido entre el 14 de octubre de 1932 y el 13 de abril de 1933, y si era un patrono no asegurado durante dicho período, las indemnizaciones que se concedieron a sus obreros por accidentes ocurridos dentro del mismo debían ser pagadas, como lo fueron, por la demandante como patrono no asegurado. Por consiguiente, no cometió la corte sentenciadora ninguno de los tres primeros errores señalados por la demandante apelante.

El cuarto señalamiento de error no necesita ser discutido, puesto que de no haberse cometido los tres errores primeramente señalados, la sentencia que dictó la Corte de Distrito de Ponce no es contraria a la ley y a los hechos de este caso.

El único error señalado por el demandado apelante es al efecto de que la demandante no sólo debió pagar el montante de las indemnizaciones concedidas a sus obreros durante el período en cuestión, si que también el importe de la póliza que fué cobrado por el demandado, ascendente a $6,016.80.

Al denegar la moción de la demandante solicitando la desestimación de la apelación interpuesta por el demandado en este mismo caso (*Central Bocachica* v. *Tesorero*, 53 D.P.R. 868, 873), insinuamos que la sección 36 de la Ley número 85

de 1928 que consideramos, al autorizar al Superintendente de Seguros para ordenar el embargo de bienes de cualquier patrono que dejare de asegurar a sus obreros y al disponer que el embargo quedaría en vigor *"hasta que el patrono acredite haber cumplido su obligación de asegurarse y se liquiden las responsabilidades contraídas por él con sus obreros durante el tiempo que no estuvo asegurado, o afiance el cumplimiento de las mismas* a satisfacción del Superintendente de Seguros"*, sostenía la contención del demandado al efecto de que en este caso no sólo tenía derecho a cobrar las indemnizaciones concedidas a los obreros, si que también el pago de la prima o cuota del seguro. Sin embargo, interpretando dicha sección 36 a la luz y en relación con las demás disposiciones de la misma, se comprende fácilmente que la razón por la cual declara en vigor el embargo hasta que el patrono cumpla las obligaciones antedichas, es porque de acuerdo con la ley, si un patrono deja de asegurarse dentro del término que determina la misma, al hacerlo más tarde es considerado como patrono no asegurado en relación con los accidentes ocurridos antes de asegurarse y como patrono asegurado desde la fecha del seguro. Pero en este caso el patrono, como hemos visto, no fué patrono asegurado en ningún momento durante el período comprendido entre el 14 de octubre de 1932 y el 13 de abril de 1933, pues el premio de la póliza no fué pagado hasta el 29 de enero de 1934, es decir, después de haber transcurrido con exceso el período en cuestión. No siendo la demandante un patrono asegurado durante el período antes aludido, no podía el Tesorero exigirle el pago de la prima de un seguro que nunca existió. En otras palabras, el demandado no puede cobrar a la demandante las indemnizaciones concedidas a sus obreros como patrono no asegurado más el montante de la cuota o prima del seguro, después de haber expirado el término dentro del cual debió asegurarse el patrono. La obligación de la demandante como patrono no asegurado es la que prescribe la ley, o sea, el pago de las indemnizaciones concedidas a sus obreros con

los correspondientes recargos y gastos de apremio, más las sanciones civil y penal que constan en las secciones 31 y 32, en caso de que quieran imponérseles. En ninguna parte de la ley se impone al patrono no asegurado la obligación de pagar la cuota después de haber expirado el término por el cual debió estar asegurado, como sucedió en este caso.

*Por lo expuesto, procede desestimar ambos recursos y confirmar la sentencia apelada.*