## Hague *versus* The City of Philadelphia.

*Right to compensation for extra work done on contract to build public bridge, controlled by want of power in county commissioners to alter contract.*

1. Where, by an Act of Assembly authorizing the construction of a free bridge over the river Schuylkill in the county of Philadelphia, the county commissioners were required to submit the site, plans, and specifications to the county board for confirmation before advertising for proposals: *Held*, that they had no power, after such confirmation, to change the location, and that where it was changed by the order of the commissioners, the county was not responsible for the additional expense of the change.

2. Hence, in an action by the contractor for extra work and materials required by such change, evidence on the part of the plaintiff that after he had commenced work the county commissioners changed the location against his objection, and required him to proceed upon another site under a promise to pay him any additional expense the work might cost by reason of the change, was held inadmissible.

CERTIORARI from the Supreme Court at *Nisi Prius*.

This was an action of *assumpsit*, by Andrew Hague against The City of Philadelphia, for extra work done by him in the erection of a bridge over the Schuylkill.

The Act of Assembly authorizing the erection of the bridge, approved March 27th 1852, provided "that before the site, plans, and the specifications are agreed upon by the county commissioners, the same shall be submitted to the county board, and a majority of said board shall confirm the same before the commissioners shall be allowed to advertise for proposals as before mentioned."

It also provided that the "proposals should be opened in the presence of, and submitted to the county board," and that "no contract for building such bridge as aforesaid shall be made and entered into by said commissioners without the consent first had and obtained of a majority of said county board."

The plaintiff was employed by the county commissioners to build the bridge at Girard Avenue, under the authority of said act, and the contract was executed April 27th 1853. He accordingly proceeded to execute the contract, the bridge was constructed by him, and has since been in public use. After the execution of the contract, the location and site of the bridge were changed, and certain necessary extra work and materials were furnished by the plaintiff by direction of the county commissioners. This action was brought to recover the amount due to the plaintiff for said work and materials, as per bill of particulars filed.

On the trial the plaintiff offered to prove that the location and site of the bridge were changed by direction of the county commissioners, by reason of the damage which said location would cause to private property and the public treasury, in opening streets to

[Hague *v.* City of Philadelphia.]

suit said location, after the work had progressed on the original site five or six weeks; that the plaintiff objected to such change of site; that the commissioners insisted upon said change, and directed the plaintiff to proceed according thereto : and it was agreed between the county commissioners and the plaintiff that the plaintiff should be paid by the county for any additional expense and work which should be caused by said change of site; that plaintiff accordingly did proceed to change said site, and furnished the necessary materials and labour.

Also to show that necessary extra work and materials, not specified in the contract and found necessary to strengthen the bridge, were furnished by plaintiff by direction of the county commissioners prior to 1854, and by the commissioner of highways, under direction of councils in and after 1854.

Also to show that the city had admitted each and both of the claims under the above offers, by payment on account.

And also to show that the county commissioners appointed a superintendent who was continued in office under the councils since the consolidation of the city, whose duty it was to superintend the work, and that all the work and materials now claimed for were furnished under his superintendence, and approved by him.

These offers were rejected by the court, and a nonsuit ordered; which were the errors assigned.

*James B. Doyle* and *William L. Hirst*, for plaintiff in error.

*David W. Sellers* and *F. C. Brewster*, for defendants in error.

The opinion of the court was delivered, January 30th 1865, by

AGNEW, J.—This was an action for extra work done by the plaintiff in the building of a bridge over the Schuylkill at Girard Avenue, under a contract founded upon a special Act of Assembly passed the 27th day of March 1852.

The plaintiff, after having given in evidence the law, the contract, and specifications, and his bill of particulars, offered to show that after he had progressed on the chosen site five or six weeks, the county commissioners changed the location, against his objection, and required him to proceed upon another site under a promise to pay him any additional expense the work might cost by reason of the change; also to prove extra work and materials found necessary to strengthen the bridge, under the direction of the commissioners, and of the commissioners of highways after 1854. This offer was rejected by the learned judge sitting at Nisi Prius, and the question is whether he was right in so doing.

We see no error in this ruling. The bridge was built under a contract which on its face refers to the law upon which it was founded, conferring upon the commissioners of the county a most

[Hague *v.* City of Philadelphia.]

special and clearly limited authority. The proviso to the 2d section of the Act of March 27th 1852 declares " that before the site, plans, and specifications are agreed upon by the county commissioners, the same shall be submitted to the county board, and a majority of said board shall confirm the same before the commissioners shall be authorized to advertise for proposals as before mentioned." In the same section, after providing for inviting sealed proposals for building the bridge, the act provides: " which said sealed proposals shall be opened in the presence of, and submitted to the county board; and no contract for building such bridges as aforesaid shall be made and entered into by said commissioners without the consent first had and obtained of a majority of said county board." The first section specially appropriated the sum of $75,000 for the building of this bridge. The contract to build it was at the sum of $73,500.

Nothing can be clearer than the intention of the legislature expressed in this act to limit and control the county commissioners in carrying out the authority to build the bridge. They are made to play a part wholly subordinate, and in subjection to the county board. Their duty is to prepare the way for the contract, sign it, and have it carried into execution; but the essential authority to decide its terms, and authorize its execution, belonged to the county board. It follows necessarily that there was no authority in the commissioners to change the site, the terms of the contract, or the plan of execution. They had not a shadow of right to do so. To admit it would be to strip the public of that protection which the act plainly intended to give by the restrictions it imposed; for to alter the contract in these essential elements requires all the authority to make it. The change of site might cause not only immense additional outlay, but the loss also of benefits which it may be supposed were within the view of the county board in their selection. Changes in plan and specification may open a wide door to many evils, not the least of which are fraud and favouritism. All experience teaches the utter impossibility of wholly preventing unfairness, and advantage taken in the execution of public contracts, even with the most vigilant watchfulness of the public interest. If, in addition, courts of justice hold that public servants can without authority bind the public for extras, even in proper and honest cases, they establish a principle which will greatly add to the demoralization of public contracts, and the means of robbing the treasury, whenever fraud and dishonesty can succeed in covering up the wrong. Now, more than ever, do we need a rigid enforcement of public contracts, and a stricter moral discipline, to defeat the varied plans by which money is taken from the treasury without authority. The older we grow as a people, the more systematized and difficult of detection do the schemes

12 Wr.—34

[Hague *v.* City of Philadelphia.]

become for plundering the public; and among them all, none are more prominent or successful than those which concern contracts and jobs.    The very elections of the people are sometimes guided and controlled by the unseen hands of rapacity.    Fraudulent claims, fraudulent prices, fraudulent receipts, and fraudulent practices are often winked at or shared in by officials in disregard of honour, honesty, and oaths.    Of course we know nothing, indeed no hint has been given to us, of the merits of this case, and our remarks have no relation to its facts.    But we refer to those known devices and schemes of public plunder occurring so frequently, to vindicate the principle of our decision, and give forth a note of warning to those who may feel disposed to embark in such dangerous enterprises.

We say then that these county commissioners, acting under an authority of the most special and limited kind, had no power to change the site, no right to change the plans and specifications, and not a particle of authority to promise payment for extra work, or to ratify its execution.    It was the folly of the contractor to rely upon their directions to proceed outside of his contract. He knew the extent of their powers defined in the law, and referred to upon the face of his written contract.    If they refused, as he alleges, to permit him to proceed in its execution, his duty was to cease operations under it, and seek his redress at the hands of those who had authority to administer it.    The principle of this case has been decided and strongly enforced in Lehigh County *v.* Kleckner, 5 W. & S. 181, and the vigorous language of Justice Rogers in condemnation of their violations of public duty, is worthy of being referred to.    We are referred to the Act of April 11th 1848, authorizing a builder to recover such sums as he may be justly entitled to, for deviations from his contract to build a county bridge under the direction of the county commissioners.    The Act of 1848 had reference only to bridges built under the general law for the erection of county bridges, and none whatever to a bridge built, as here, under a special act and a limited authority.    Under the General Road and Bridge Law of 1836, county commissioners are the only representatives of the public authority and interest, having no superiors in determining the estimate of the cost, and the plans and specifications of building.    There was some greater propriety, therefore, in permitting a recovery, for deviations under their direction.    But here the act is special, limits the sum to be expended, restricts the powers of the commissioners to the mere performance of a ministerial duty, and guards the contract by provisions which operate directly upon the action of the commissioners, and notifies the contractor of his own duty.    The Act of 1848 has no reference to this case, and cannot help the contractor.

The judgment is affirmed.