Willis Bancroft, Inc., *v.* Millcreek Township, Appellant.

Argued May 9, 1939. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

530

*Harold F. Mook,* with him *James W. Evans,* for appellant.

*Henry A. MacDonald,* with him *A. Grant Walker* and *Gunnison, Fish, Gifford & Chapin,* for appellee.

OPINION BY MR. JUSTICE MAXEY, June 19, 1939:

A written contract was duly entered into by the plaintiff-appellee, Willis Bancroft, Inc., with the Township of Millcreek, the appellant, on December 4, 1934. It related to the construction of a sanitary sewer system of approximately three miles in the township, as a W.P.A. project. It required that the labor be furnished by the Federal Relief Administration, and the materials were to be furnished by the township. The work was divided into three parts. Items 1 and 3 were awarded to the appellee. These two sections were connected by a section known as Item 2, which was awarded to another contractor. The Bancroft Company, which received the award of Items 1 and 3, agreed on its part to furnish skilled supervision of the work allotted to it, in accordance with the plans and specifications, which included the construction of collection manholes and two pump stations, and to furnish for the job all necessary tools, equipment, fuel, a shelter building and shoring materials necessary for bracing trenches. The contract called for the construction work to begin "within five days after written notice to do so shall have been given to the contractor, and shall be carried on at a rate to insure its full completion within four and a half months thereafter, the rate of progress and *the time of completion being essential conditions* of the agreement." (Italics supplied.) The contract price was based upon unit bids per lineal foot of different depths of sewer actually dug and laid. Maps, plans, profiles and specifications, containing designations of the line of the pro-

posed sanitary sewer, its grade and depth, as well as the sizes and kinds of pipe to be used, were furnished by the township to bidders, and are incorporated and are part of the contract. Provision was written into the "General Specifications" and into the body of the contract for changes as the work progressed. In Article III, the parties provided "that the unit quantities shown are only approximate and may not represent the actual amount of work to be performed. . . . The prosecution of this work is dependent entirely upon labor furnished by the Federal Relief Administration, and in case the Relief Administration fails to furnish the labor, or is discontinued, or for any other reason the labor supply from the relief administration is discontinued, the township or the supervisors thereof shall not be liable to the contractor for any damages or for any payments except for unit payments of the amount of work actually completed."

In Article IV of the contract the parties recognized that there may be extra work for which extra pay would be given to the township. It provided that "authorized extra work shall be included in progress payments," and in paragraph numbered 13 of the "General Specifications," which forms a part of the contract, it is provided that "the engineer can make any alterations to, or omissions from the work . . . that he may find necessary and the same shall be acceded to by the contractor. The value of such alterations, additions or omissions shall be added to the schedule of prices contained in the proposal for this work, or in case the work . . . is not embraced in said schedule a price shall be agreed upon in writing between the council and the contractor before such alteration is made, otherwise no allowance shall be made thereof." In the "General Specifications" is also found the provisions that "in case any dispute arises . . . or in case any claim shall be made by the contractor . . . including any claims for damages for delay in the completion of this agreement, in every such

case the disputed claim shall be submitted to the engineer for decision and his award or decision thereon shall be final and conclusive and binding upon all parties hereto; and such award or decision in case any question shall arise, shall be a condition precedent to the right of the contractor to receive any money hereunder."

The construction of the sewer system was actually started a few days before the written contract was executed by the parties in 1934, and it continued until some time in May, 1936. The contractor had received from the township $7,495.72, in "progress payments," on the engineer's estimate of work completed, the final estimate being dated November 20, 1936. However, on June 11, 1936, the contractor brought this suit against the township to recover a balance of $20,603.99, which it alleged was due. A statement of claim was later filed and the parties soon after agreed to a voluntary arbitration, reserving the right of appeal on questions of law, in accordance with the Act of June 16, 1836, P. L. 715, 5 PS 1. The authority in the township supervisors to submit to arbitration under the Act of 1836 can be found in the Act of May 13, 1925, P. L. 670, sec. 2, 5 PS 181.

The majority of the arbitrators found in favor of the contractor and awarded it $7,461.54. The township excepted, the exceptions were dismissed by the court in banc, and this appeal followed.

The contractor based its cause of action *on an implied contract,* on a quantum meruit, to recover the reasonable value of the services of supervision, and a fair rental value of the equipment and machinery used on the project, because of the changes from the plans and specifications on which it bid. It pleaded "a complete abandonment of said contract" by reason of the material and important changes in the construction of this sewer system. It also pleaded that it was not subject to the unit prices in the contract because "of the abandonment of the contract in its entirety" by the

township. It concluded its statement with the plea that "the changes of the requirements . . . from the terms of the contract resulted in great financial loss and damage to the plaintiff."

The testimony presented to the Board of Arbitration was made a part of the record. From this testimony the court below found, and an examination of it sustains the court's findings, that "the following are some of the changes required by the engineer. The plans of Item No. 3 showed pipe on the top of the ground at a designated location. This pipe plaintiff [contractor] was required to lay three feet deep on trestle work through a swamp. Between stations 57-0 and 62-50 the proposal called for 550 feet of sewer 8½ to 10½ feet deep. This section was required to be laid from 12 feet to 14 feet deep. The final 4,000 feet of the sewer was lowered. At least on one occasion the engineer changed the grade after the ditch had been dug and some pipe laid. Along the Algeria Farm the location of the sewer was moved so near a large barn that the work had to be done by hand, 40 to 50 men consuming seven weeks, whereas the plans called for a location where the sewer could have been dug efficiently and expeditiously by the special machinery and power equipment furnished by the plaintiff. Sections of Item No. 3 were to be built over definite private rights-of-way. These rights-of-way never were acquired by the defendant and the route of the sewer was therefore changed to adjacent public roads, greatly increasing the length of the sewer and adding to the amount of supervision and time consumed. In one section of the work, 1,000 yards of fill were required due to change of location. In another the contractor was required to build a corduroy road. Near Eaglehurst Pump Station the depth was increased 3½ feet for a distance of 861 feet and 1.9 feet for a distance of 275 feet. Many other changes were directed by the engineer deviating more or less from the plans and specifications. All of these changes added to plaintiff's

costs. The estimated labor cost of $25,000 was only one-fourth of the actual cost and increased the premiums which plaintiff had to pay on its bond. The contract contemplated completion of the work in 4½ months. It actually took 17 months, during all of which time plaintiff's machinery was on the project." During a large part of the time there was no work being done, and for a full month, March, 1935, the testimony shows it was due to the fact that the government discontinued the labor. Yet the contractor filed its claim for this time and the arbitrators apparently awarded it to the contractor. Continuing the court's findings, it said: "Deepening the sewers added greatly to the time consumed in construction, for the ditch must be wider with broader slopes and the excavated material must be handled at a disadvantage, and additional lumber is required for increased shoring. Often the deeper the trench the more water and quicksand is encountered; more pumping is required and the operation of lowering and laying the pipes is slower."

In the Arbitration Agreement, the parties reserved "all matters of law arising thereupon for the decision of the court" in accordance with the Arbitration Act of 1836, "otherwise said decision to be final . . . and shall have the same force and effect as a verdict of a jury. . . ." The decision of the arbitrators by agreement, here, has the force and effect of a verdict of a jury and will not be disturbed on appeal if there is evidence to support it. But the matters of law were reserved for the decision of the court. The case was tried throughout on a cause of action based on an implied contract in parol. The written contract was declared to have been abandoned. In the trial before the arbitrators, counsel for the township again reserved the "substantial legal question" of whether "the contract which was entered into between Willis Bancroft, Inc., and the Millcreek Township has been abandoned." The report of the arbitrators set forth the finding "that the

changes and delays for which the contractor was not responsible were sufficient to set the original contract aside." To this legal conclusion specific exception was taken by the township. The basis of the opinion of the court in banc and its decree is ". . . that the original written contract was abandoned and in law an implied contract in parol was substituted for it, and, therefore, judgment should be entered for the amount of the award."

The legal question that presents itself is whether a township can be made liable upon an implied contract in parol involving an expenditure of over $500.

The answer is found in the Township Act of June 24, 1931, P. L. 1206. Section 1801 (53 PS 19092-1801) provides: "Townships shall have power to make such contracts as may be necessary for carrying into execution, provisions of this Act and the laws of the Commonwealth." Section 1802, amended by section 1 of the Act of July 18, 1935, P. L. 1176 (53 PS 19092-1802), provides: "All contracts or purchases made by any township, involving the expenditure of over $500 shall be in writing. . . . *Any contract made in violation of the provisions hereof shall be void. . . .*" (italics supplied).

In none of the cases cited by the learned court below to sustain its opinion, with the exception of *Salt Lake City v. Smith,* 104 Fed. 457 (CCA 8), was a municipal contract involved. In that case the contractor agreed to construct a conduit for the city and to do such extra work as the engineer of the city might require. The engineer required material changes in the line of conduit for the last mile from comparatively level ground to a course requiring the construction of an extensive cut stone and concrete dam and through hills and on embankments over ravines, the lining of the tunnels with concrete and cut stone masonry, the laying of heavy iron pipes therein, for which extra work they asked to recover $97,007.61. The court found that these

"extras" were "not contemplated by the parties when they made their agreement, and were not within and governed by the contract. . . ." In other words, the contract and the work *and the pleadings of the contractor* in that case, "materially differ from the contract and work and pleadings of the parties involved in the case before us." The Circuit Court of Appeals for the Fifth Circuit, in the case of the *City of Mobile v. Shea*, 127 Fed. 521, distinguishes that case upon that (quoted) ground. In the last cited case, the plaintiff's pleadings were similar to those before us. In that case, as here, the plaintiff pleaded that the writings *"were wholly set aside*, and the work, so far as any work was done, was prosecuted, and settlements therefor made under a verbal contract which did not stipulate for definite prices, but left parties at large to settle on the basis of a reasonable value of the work, materials, labor and transportation used," (italics supplied). The court held the contract was not set aside, and that the parties bound themselves "by express stipulation that the engineer's determination should be final and conclusive, on possible disputes arising between them. . . . ."

It is settled law that a municipality is not liable, under ordinary circumstances, on an *implied* contract involving an expenditure over the statutory limitation. It is established in Pennsylvania that a municipality cannot be held liable for work done for it except under a contract in writing, duly executed as required by the several acts of assembly respecting such municipality. We have so held upon the principle that an implied contract with a municipality is expressly prohibited here by statute. The courts will not assist any claimant to avoid the mandate of the statute by permitting a recovery upon a quantum meruit for service rendered or material furnished. See *Hague v. City of Philadelphia*, 48 Pa. 527: *Morgan v. Johnstown*, 306 Pa. 456, 464, 160 A. 696; *Reilly v. Phila.*, 60 Pa. 467; and Dillon on Municipal Corporations (5th ed.), Vol. 2, sections 794

and 795 (pp. 1187, 1188). See also opinion of FIELD, C. J., in *Argenti v. San Francisco,* 16 Cal. 255; *Collector v. Hubbard,* 12 Wall. 1, 12; and *Curtis. v. Fielder,* 2 Black (U. S.) 461.

In the State of Ohio a restrictive statutory provision similar to ours and relating to municipal contracts prevails, and it was there held that "full force has been given to the restrictive statutes of the state, and implied liability denied, and the doctrine established that public officers can incur obligations against those for whom they act, only in pursuance of the provisions of the statutes and that they cannot deal upon the quantum meruit or reasonable value plan. . . . A strict adherence to the provisions of the restrictive statutes of the state will be for the general good, and it devolves upon those who deal with public officers to see for themselves that the statutes have been complied with. . . . There being no implied municipal liability in cases ex contractu . . ., it follows that to state a good cause of action against a municipality in such cases, the petition must declare upon a contract . . . made and entered into according to statute. A petition on an account merely, or quantum meruit, in such cases, is not sufficient . . .:" *City of Wellston v. Morgan,* 65 Ohio St. 219, 62 N. E. 127.

In the case of *Hague v. City of Phila.,* supra, Justice AGNEW said: "Changes in plan and specification may open a wide door to many evils, not the least of which are fraud and favoritism. All experience teaches the utter impossibility of wholly preventing unfairness, and advantage taken in the execution of public contracts, even with the most vigilant watchfulness of the public interest. If, in addition, courts of justice hold that public servants can without authority bind the public for extras, even in proper and honest cases, they establish a principle which will greatly add to the demoralization of public contracts, and the means of robbing the treas-

ury, whenever fraud and dishonesty can succeed in covering up the wrong. . . ."

In *Smith v. Phila.*, 227 Pa. 423, 431, 76 A. 221, where the Act of May 23, 1874, P. L. 230, relating to the City of Philadelphia, having similar statutory provisions to those of the Township Act, was involved, we said: "These statutory provisions . . . are mandatory and must be strictly complied with. They cannot be evaded or disregarded by the city or by its officials. The protection of the public as well as the rights of the contractor require their rigid enforcement."

In the instant case, however, we have an express provision in the contract "that the engineer can make any alterations to, or omissions from the work herein specified during its progress, that he may find necessary and the same shall be acceded to by the contractor. The value of such alterations, additions or omissions shall be added to the schedule of prices contained in the proposal for this work, or *in the case the work in any such alteration is not embraced in said schedule a price shall be agreed upon in writing between the council and the contractor before such alteration is made, otherwise no allowance shall be made thereof."* (Italics supplied.) The contractor pleaded that the "altered work" is not "embraced" in the contract. His agreement then called for a "writing between the council and the contractor before such alteration is made." No such writing was produced and no such writing was authorized by the township. This clause was in strict compliance with the Township Act. The plea that it was upon orders of the engineer cannot avail the contractor. The engineer was without authority to make a new contract with the contractor to bind the township. When any proposed alterations were not embraced in the contract, it was the contractor's duty to meet the township supervisors and to agree to a price for such alterations "in writing" before it made the alterations. Its failure to do so calls into force and effect the remainder of the

provision, namely, that "no allowance shall be made thereof." This is what we held in the similar case of *Morgan v. Johnstown,* 306 Pa. 456, 465, 160 A. 696. We there said, speaking through Mr. Justice SCHAFFER: "The principal claim of the plaintiff.is based upon the fact that the line of the sewer was changed and the allegation that this created the necessity for his doing extra work at additional expense. It is not denied that the change was made. If the plaintiff was not willing to proceed under the contract, he should have refused to go on with the work until he obtained the proper written authority of the engineer. . . ." So in the case at bar, if the plaintiff was not willing to proceed under the contract, it should have refused to go on with the work until it obtained the proper written authority between the council and itself.

In *McManus v. Phila.,* 201 Pa. 619, 51 A. 320, it was held that where a contractor agrees in writing with the City of Philadelphia for a sum stated to build a police and fire patrol station, and, in the progress of the work, in obedience to parol instructions from the city architect, puts in heavier girders of a more expensive character than the contract called for, so as to comply with the city building regulations, and also in pursuance of parol instructions from the same official, puts in a more expensive building stone than that required by the specifications, because the latter was not obtainable, the contractor cannot recover the increased costs of these items from the city, inasmuch as the changes in the contract were not made in the manner provided by article 14 of the Act of June 1, 1885, P. L. 37, which enacts that "all contracts relating to city affairs shall be in writing, signed and executed in the name of the city." In the case of *McManus v. Phila.,* 201 Pa. 632, 51 A. 322, filed the same day the opinion in the first McManus Case was filed, this court, in an opinion by Justice DEAN, said: "Without such interpretation the Act of June 1, 1885 [relating to contracts for public

improvements entered into by the city of Philadelphia under its charter] in that section is useless; that a contract solemnly entered into between a municipal corporation in writing can be altered, added to or amended by the mere say so, of a subordinate officer and his subordinates, leaves the corporation subject to the very abuses which flow from the unchecked fraud, falsehood and dishonesty the statute seeks to guard against. And there is no hardship to the contractor in enforcing this rule. He can protect himself by proper stipulations in his first written contract from unforeseen increased expenditures. If he does not do this then, he must and ought to take the risk. He is not bound to accept a contract from a city any more than he is forced to make one with an individual." To the same effect is *Union Paving Co. v. Phila.*, 263 Pa. 577, 107 A. 370. In that case the judgment of the court below was affirmed by this court per curiam. In the opinion of the court below appears the following statement: "The reason for exacting a strict compliance with this most salutary requirement of the city's organic law [i. e., all contracts relating to city affairs shall be in writing, signed and executed in the name of the city] is thus stated by the late Chief Justice Sterrett in *Hepburn v. Philadelphia*, 149 Pa. 335, 24 A. 279; 'To hold otherwise would defeat the very object that the legislature had in view in thus specifically prescribing the manner in which all contracts relating to city affairs shall be executed, and expose the public funds to raids of every conceivable form.' "

In the Law of Municipal Corporations by McQuillin, 2nd ed., Vol. 5, sec. 2093 (page 417), there is laid down this principle: "If the contractor does extra work not required by the contract and without authority from the municipality he cannot recover therefor, as work done by direction of a municipal officer without power to order such work done, although he may be the supervisor appointed by the municipal corporation to super-

intend the execution of the contract. To bind the municipality for extra work the authority to perform such work must be given in the manner prescribed by law or in accordance with the terms of the contract, for example, where the order is to be given in writing, or where the contractor is required to submit a written statement of extra work and claim for extra work. A provision which is common, that no extra work shall be paid for or allowed unless done on the written order of a designated corporate officer, as one in charge of the work, it is held, may be waived; however, this has been denied. The promise of a municipal officer, to the contractor to pay for extra work is not binding." [*]

In 44 C. J., sec. 2216 (page 117), this principle is laid down: "The requirement that the contract be in writing is applicable in suits of equity as well as in actions at law, and to all contracts within the terms of the statute, and to contracts for additional work, even though the contract for the original work is in writing."

Since plaintiff's claim against the defendant township involves an expenditure of over $500 and since the claim is not based on a contract in writing but avowedly is based, as plaintiff pleads, on charges which are "fair and reasonable and in accordance with general contractors' principles and prices in this vicinity," it is therefore based on an implied contract and *such* a contract under the circumstances here present is void, as the above quoted Act of June 24, 1931, declares.

---

[*] McQuillin says in section 2091 (page 408): "Municipal corporations are liable to actions of implied assumpsit with respect to money or property received by them and applied beneficially to their authorized objects through contracts which are simply unauthorized as distinguished from contracts which are prohibited by their charters, or some other law bearing upon them, or are malum in se, or violative of public policy. In some jurisdictions assumpsit is the proper remedy of the contractor to recover special assessments collected by the municipality where nothing remains to be done but to pay over the money."

The matters of law reserved by the parties to the Arbitration Agreement, in accordance with the Arbitration Act of 1836, must be decided in favor of the defendant.

The judgment is reversed.