Eleanor ROSEMAN

v.

William W. HASSLER et al.

Civ. A. No. 73–1082.

United States District Court,
W. D. Pennsylvania.

Sept. 24, 1974.

Louis LaLumere, Pittsburgh, Pa., Michael Brodie, Philadelphia, Pa., Killian & Gephart, Harrisburg, Pa., for plaintiff.

Larry Selkowitz, Deputy Atty. Gen., Israel Packel, Atty. Gen., Harrisburg, Pa., for defendants.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

KNOX, District Judge.

Plaintiff, Eleanor Roseman, served as an associate professor in the Foreign Language Department at Indiana University of Pennsylvania beginning with the academic year which commenced September 1, 1969, and continuing until the end of the academic year which commenced September 1, 1970, and ended June 1, 1971. On May 12, 1970, she was informed of her non-retention for the academic year beginning September 1, 1971. On December 20, 1973, she instituted this action against the university, its president and various members of its faculty asking for reinstatement, injunctive relief and damages. Hearing on an application for preliminary injunction was held but no order was entered inasmuch as the request for preliminary injunction was withdrawn. Thereafter, a hearing was held commencing July 29, 1974 in which was incorporated the evidence taken with respect to the preliminary injunction. Prior to the final hearing on the merits, defendants filed a motion for partial summary judgment on May 14, 1974, and a motion for total summary judgment on the balance of plaintiff's claims on July 22, 1974. While arguments on the motions for summary judgment were heard, disposition of them was postponed until the case had been heard on the merits.

## FINDINGS OF FACT

1. Indiana University of Pennsylvania is an educational institution owned and operated by the Commonwealth of Pennsylvania.

2. Under the Pennsylvania Public School Code (24 P.S. § 20–2004.1(14) ), the management of Indiana University of Pennsylvania, including the power to make rules with respect to faculty tenure is entrusted to the president and the board of trustees.

3. Indiana University of Pennsylvania has a formalized tenure system with a

probationary period of three years specified unless "initially specified otherwise". (See Manual, plaintiff's Exhibit 4). Faculty are hired on a year to year basis during the probationary period.

4. Pursuant to the laws governing the university of which plaintiff was or should have been aware, department chairmen, divisional deans and academic vice-presidents do not grant tenure, but only make recommendations to the president who presents them to the board of trustees for approval. This is the only way tenure can be obtained.

5. Under regulations and practices of the university, the university was required to provide reasons for a termination and a hearing only to tenured faculty.

6. All faculty, including both tenured and non-tenured members, may be dismissed for "immorality, incompetency, treason or insobriety", but a member of the probationary faculty, as was plaintiff, may be non-renewed or terminated for any or no reason, as long as the laws or constitution are not violated.

7. Under university practice, grants of tenure are made by an official communication of the president only.

8. The Notices of Appointment of plaintiff (Plaintiff's Exhibits 2 and 3) contain the relevant and important terms of her employment and constitute the complete employment contracts of the plaintiff.

9. The initial specification of any additional terms, as referred to in the Faculty Manual, is placed on the Notice before it is sent to the potential employee. Plaintiff's handwritten codicil at the bottom of plaintiff's Exhibit 2 is not an initial specification as contemplated by the Manual (Plaintiff's Exhibit 4) but a unilateral counterproposal by plaintiff not assented to by the university. Plaintiff's handwritten codicil was added by plaintiff after the president had signed the contract. There was thus no meeting of the minds as to additional terms.

10. Defendant Herbert Isar in February 1969, as chairman of the Foreign Language Department offered plaintiff, as a probationary employee, a permanent position in accordance with the regulations of the university.

11. A probationary employee is one without tenure and is subject to discharge at any time without cause.

12. A permanent position is one created by the administration which refers to the nature of the position, i. e., non-temporary, and not to the status of the employee holding that position. This is distinguished from the position of a temporary employee filling a position created for a limited period of time or a substitute.

13. Plaintiff was not hired as a tenured member of the faculty; she was only hired to fill a permanent non-temporary position, which, if performed satisfactorily, might lead to tenure.

14. Plaintiff was not given a pre-termination hearing by the university because she was not tenured and because no hearing was required for probationary employees.

15. Plaintiff never asked the university for a hearing until September, 1971, nearly one and one-half years after she was non-renewed and after she had left the university.

16. Plaintiff was not offered an administrative hearing until after her discharge became effective and she had left the university. Plaintiff objected to certain conditions of the hearing offered and while the proposed hearing apparently provided due process, plaintiff's objections were not frivolous.

17. On May 12, 1970, the Committee on Merit and Tenure of the Foreign Language Department voted unanimously (with one abstention) not to renew plaintiff's contract at the end of the 1970–71 academic year.

18. The Jewish Holiday, Rosh Hashanah, in 1969 fell and was celebrated on Saturday and Sunday, September 13

and 14, when plaintiff had no classes. Plaintiff is Jewish.

19. Plaintiff missed classes on Friday, September 12 and Monday, September 15, 1969, because she went to Philadelphia for medical appointments and not for religious holidays. Thereafter, she reported she was ill in Philadelphia until November 11, 1969.

20. Plaintiff's colleagues covered her classes on those days as well as on all other days plaintiff was absent for medical and other reasons.

21. The frequent coverage of plaintiff's classes by her colleagues was burdensome and more frequent than the coverage required for any other member of the department.

22. Plaintiff was never refused permission to observe her religious holidays by any of the defendants; but they were aware of the absences.

23. Plaintiff was absent April 2 through 6, 1970, claiming she was snowbound in Michigan.

24. Plaintiff missed classes on Monday, April 20, 1970, which had to be covered by colleagues. Her absence was caused by a trip to Philadelphia to celebrate Passover.

25. Plaintiff failed to provide a scheduled written test to the professor covering for her, who was to give it to her class on Monday, April 20 or Wednesday, April 22, of that week. On both days, the students were prepared for but did not receive the scheduled test.

26. Plaintiff's absences, under state regulations, had to be charged to sick leave, as professional employees had no annual or personal leave in 1969 or 1970.

27. Plaintiff's Exhibits 14, 15 and 17, which indicate some anti-semitic bias and ill will towards plaintiff, were authored by defendant Henninger but were never sent to the plaintiff on the advice of defendants Faust and McGovern, who felt they would not help resolve the situation.

28. These exhibits were never seen by, nor discussed among the members of the Committee on Merit and Tenure which voted to non-renew plaintiff by a vote of ten "yes" and one "abstain", and thus the memos in no way prejudiced the plaintiff in the department's decision to recommend her non-renewal.

29. Plaintiff's Exhibits 14, 15 and 17 were initially placed in the personal file of Mr. Faust, not plaintiff's personnel file. In the late Summer and Fall of 1970 and after the decision to non-renew, because of plaintiff's threats of litigation, the exhibits were placed in plaintiff's personnel file for the purpose of recall.

30. Plaintiff's Exhibits 14, 15, 16 and 17, as well as all other material provided to her in 1972, were never seen by any potential employer of plaintiff. No potential employer has ever made an inquiry of the university concerning plaintiff.

31. The individual defendants never discussed plaintiff's religious beliefs or observances with other members of the Committee on Merit and Tenure.

32. There is no connection at all between any writings of any defendant and the decision to non-renew plaintiff.

33. Defendants Isar and Faust voted for non-renewal based on work-related reasons. Defendants Hassler, McGovern and Henninger took no part in the vote to non-renew of May 12, 1970.

34. Plaintiff was non-renewed because of her work practices which created administrative hardship and delays, her inadequate classroom performance and her failure to get along amicably in the department.

35. Plaintiff made a complaint to Dean McGovern on April 5, 1970, that defendant Faust had wrongfully suppressed an application of Dr. James Hyde for chairman of the department and later repeated the same in a departmental faculty meeting.

36. Plaintiff's conduct seriously impaired the orderly functioning of the chairmanship screening committee.

37. Defendant Faust had turned over the application in question to Dr. Op De

Beeck, in the normal manner, thus committing no improprieties.

38. The screening committee deadline for applications for chairman was tentatively March 31, 1970.

39. The Hyde Application in question was received after the deadline on April 10, 1970.

40. Plaintiff had never specifically asked Mr. Faust about the Hyde application from April 10, 1970, until she stepped forward at the department meeting on May 5, 1970, at the invitation of Dean McGovern.

41. Defendants Hassler, McGovern and Henninger had no part in the decision to non-renew.

42. Defendant Isar was not involved in this or any other of plaintiff's causes of action beyond negotiating with plaintiff prior to her first appointment.

43. All of the members of the Committee on Merit and Tenure which voted to non-renew plaintiff had discussed, in detail, and evaluated plaintiff in March 1970 and were personally aware of her record and performance.

44. There were valid work-related reasons as above set forth for the departmental decision to non-renew plaintiff.

45. The decision to non-renew plaintiff was not made in retaliation for the exercise of any valid right of free speech.

46. Plaintiff was a probationary employee hired to fill a permanent position which, if she performed satisfactorily, could lead to tenure in three years.

47. Plaintiff was non-renewed pursuant to the university procedural regulations for probationary employees, which regulations were administered by the various defendants in the course of fulfilling their prescribed duties and responsibilities.

48. Only the president, not a departmental chairman, can set terms of employment, such as salary, employment status (professor, assistant professor, instructor, and so forth) and tenure in a contract with a prospective instructor.

49. Course assignments and course load are matters within the departmental chairman's discretion and were not part of the contract of employment.

50. Plaintiff knew that the new chairman would be Mr. Faust, not Dr. Isar, and she should have known to make her requests for specific courses to Mr. Faust. Plaintiff knew this in February 1969, eight months before she began teaching at the University and before she signed her first contract.

51. Plaintiff taught all the courses scheduled for her by Dr. Isar during the first semester of her employment, which is the only time period for course assignment over which the defendant Dr. Isar had any control of discretion.

52. For the 1969–70 academic year, plaintiff was hired at and accepted an appointment to the rank of associate professor at Step B or $10,720 per annum; which was the amount mentioned by Dr. Isar in his letter (Plaintiff's Exhibit 1) to plaintiff and the amount which plaintiff accepted in writing by signing her first contract.

53. Plaintiff's salary was raised to $11,240 for the year 1969–70 by the university as a result of change in pay scales, although the university had no obligation to do so.

54. In accordance with the provisions of her contract, plaintiff, when the need arose, could be assigned additional teaching hours in the discretion of the chairman provided the assignment was reasonable.

55. The assignment of specific courses is within the discretion of the department chairman.

## DISCUSSION

### I. GENERAL

Plaintiff in her complaint originally sued Indiana University of Pennsylvania, at Indiana, Pennsylvania, a state educational institution, William W. Hassler, as President, Herbert Isar, for-

merly Chairman of the Department of Foreign Languages, Charles Faust, his successor as Chairman of the Department, Isolde Henninger, Administrative Assistant or Assistant Chairman of the Department, and Frances McGovern, Dean of the College of Arts and Sciences. The complaint is in 8 counts. Count 1 alleges deprivation of civil rights under the First and Fourteenth Amendments and deprivation of contractual rights through lack of due process because no hearing was held prior to plaintiff's non-retention. Count 2 alleges a violation of the Civil Rights Act and the First and Fourteenth Amendments in that the decision for non-retention was allegedly based upon religious discrimination, plaintiff being of the Jewish faith. Count 3 alleges violation of the Civil Rights Act and the First and Fourteenth Amendment in that her non-retention was based upon an attempt to restrict her freedom of speech.

Pendent causes of action are contained in the later counts. Count 4 claims that plaintiff was a tenured faculty member and discharged in violation of her contract without hearing. Count 5 alleges that she was not paid in accordance with her contract and the step upon the pay scale upon which she should have been placed. Count 6 alleges that the contract engaging her was violated by assigning her a teaching load in excess of twelve hours. Count 7 alleges tortious interference by the defendants with her contractual relations. Count 8 also claims a violation of her contractual rights in that she was not assigned to courses originally agreed upon.

■ Defendants, soon after the action was filed, filed motions to dismiss. These motions were denied except that by order of February 13, 1974, Indiana University of Pennsylvania was dismissed as a defendant for the reason that it was not a person under the Civil Rights Act, 42 U.S.C. § 1983, and that insofar as it is named as a defendant otherwise in the case, it is not subject to suit in this court because of the provisions of the Eleventh Amendment. It

was determined that this institution was a branch of the Pennsylvania State Government, and insofar as this was a suit against the Commonwealth for violation of a contract, procedures provided by Pennsylvania law for determination of such suits must be followed.

II. *The Position of Indiana University.*

The court has approached the final resolution of this controversy in accordance with the guidance given us by the Court of Appeals for this circuit in Skehan v. Board of Trustees of Bloomsburg State College et al., 501 F.2d 31 (3d Cir. 1974). In that case the court said:

"As to property rights the appropriate analysis is to determine, under applicable state law, the nature and extent of the contract right and, if the contract right has been terminated other than by expiration of its term, to consider whether the method of termination comported with fourteenth amendment procedural due process. If a procedural due process violation has occurred, the court proceeds to fashion a remedy. With rights of liberty, such as the right of a faculty member to be free from disability imposed for engaging in speech protected by the first amendment, the analysis starts with an inquiry into the substantive reasons for whatever action is complained of. *If it is found that either termination or nonrenewal was because of the exercise of protected speech (as an example), the procedural due process of the decision is irrelevant because the substantive decision is illegal as a matter of federal constitutional law.* If such a substantive violation of a right of liberty has occurred, the court proceeds to fashion a remedy which, depending on the circumstances, may be the same as or different from the remedy for a procedural due process violation in the property context."

The court adheres to its decision of February 13, 1974, that we have no jurisdiction over Indiana University of

Pennsylvania, it not being a person under the Civil Rights Act and being a branch of the State government of Pennsylvania. As it was pointed out in Skehan, supra, Indiana University which is set up as a part of the Pennsylvania Department of Education (See 24 P.S. § 20–2002 (14) ) is not "a separately chartered corporation as in the case of many universities but a subdivision of the Commonwealth Department of Education".

It is specified further in 24 P.S. § 20–2003: "The colleges and universities shall be a part of the Commonwealth system of higher education." Under 24 P.S. § 20–2003.1 provision is made for a Board to be established in the Department of Education to consist of fifteen directors, appointed by the Governor, to be known as the Board of State College and University Directors. In 2003.3(3) it is provided that the Board has powers and duties:

> "To develop general rules for faculty appointments, salary schedules and benefits and to establish broad policies regarding employment rights, promotion, dismissal and tenure of faculty."

Section 2004 provides for a Board of Presidents of State Colleges and State Universities to recommend educational policies for these institutions. In 2004.1 it is specifically provided that the "President of each of the several * * * State Universities shall administer the institution. Each President shall have the power and his duty shall be:

> (1) *To appoint* such officers, *faculty members,* graduate assistants, and employes as may be necessary in accordance with the law, and the standards set by the Executive Board of the Commonwealth and policies of the Board of State College and University Directors.
>
> (2) *To fix the salaries* of instructional and noinstructional employes in accordance with law, and the standards set by the Executive Board of the Commonwealth and policies of the

Board of State College and University Directors.

> * * * * * *
>
> (14) *To establish rules* regarding employment rights, promotions, dismissals and tenure of faculty and other employes, subject to the approval of the Board of Trustees and in accordance with broad policies established by the Board of State College and University Directors."

In 2008.1 and 2008.2 provision is made for a Board of Trustees for each of the State Colleges and Universities, consisting of nine members. In 2008.3, it is provided:

> "The Board of Trustees of each State University shall have the power and its duty shall be to:
>
> * * * * * *
>
> (2) Approve recommendations of the president pertaining to (i) budgets and expenditures and forward same to the Board of State College and University Directors; (ii) the waiver of fees; (iii) schools and curricular programs; and (iv) the appointment, rank, salaries, tenure of instructional staff and noninstructional staff and administrative personnel in accordance with law, and standards set by the Executive Board of the Commonwealth, the Civil Service Commission, and policies of the Board of State College and University Directors."

In view of the fact that Indiana University is not separately chartered and is not described by statute as being a body corporate and politic with power to sue and be sued and considering all the other provisions of the law indicating that the institution is an integral part of the state government with the president thereof being the agent for management of the same, it is the court's conclusion that it is not subject to suit as a subsidiary governmental unit to which Ayala v. Philadelphia Board of Public Education, 453 Pa. 584, 305 A.2d 877 (1973) might apply and instead is included in the sovereign immunity of

the Commonwealth. See Employees of the Department of Public Health, Education & Welfare of the State of Missouri v. State of Missouri, 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973) and Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). The latter case indicates that in certain circumstances, prospective injunctive relief may be ordered against state officials but relief may not include a retroactive award requiring payment of funds from the State Treasury. In the case at bar, plaintiff not only seeks reinstatement but also seeks back pay and other damages. If Indiana University were a subsidiary governmental unit, non-prospective monetary relief might be available. In view of our determination that this university is an integral part of the state government, its dismissal as a defendant was proper, but this of course does not necessarily bar prospective relief, whether legal or equitable, against the individual defendants under Skehan, supra.

### III. *Contractual Rights.*

Plaintiff's claims to contractual rights and due process hearings are contained in Counts 1, 4, 5, 6 and 8.

As to these matters, we agree with the decision of Judge Gourley of this court in Walker v. California State Board of Trustees, 351 F.Supp. 997 (W.D.Pa.1972) aff'd 485 F.2d 683 (3d Cir. 1973).

In this case, Judge Gourley held that California State College another one of the state colleges and universities (24 P.S. § 20–2002(10) ) had not given tenure or expectancy of tenure arising from any de facto tenure policy so that plaintiff had any constitutional right to a hearing or to specific reasons for his dismissal, and that plaintiff had not been stigmatized in such a way that other employment opportunities were barred to him.

Judge Gourley held that the plaintiff as a faculty member was bound by the faculty manual with respect to tenure and that there was no evidence of any de facto tenure policy. He therefore held that plaintiff was not entitled to a due process hearing under Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); and Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

In the present case, a reference to Pennsylvania State law as above outlined indicates that the establishment of policies with respect to employment rights, dismissal and tenure is generally in the hands of the various Boards set up under state law and that the president of each state university such as Indiana has the power and duty to appoint faculty members and fix salaries in accordance with the law and standards and policies and that under 20–2004.1(14) he has the right to establish rules regarding employment rights, promotions, dismissals and tenure.

■ ■ Anybody dealing with the Commonwealth of Pennsylvania or any of its departments or branches such as Indiana University is bound to take notice of the legal authority of the various persons with whom she deals. In this particular case, statements and letters, and so forth from the chairman of the department are clearly without authority, and plaintiff can base no legal claim to tenure upon them. See Commonwealth v. Seagram Distillers Corp., 379 Pa. 441, 109 A.2d 184 (1954); Willis Bancroft, Inc. v. Millcreek Township, 335 Pa. 529, 6 A.2d 916 (1939).

Referring to the manual of procedures and conditions of employment for professional and non-professional staff members at Indiana University (Plaintiff's Exhibit 4), we find the subject of contracts and tenure is covered in Part B beginning at the bottom of page 3. Most significant is the third paragraph on page 4.[1]

---

1. "While the mutual agreements are signed or re-signed each year, *the new member of the*

*faculty understands that his employment is to be on a year to year basis for a proba-*

Under this manual, plaintiff was a probationary employee and did not acquire tenure or continuous employment because the three-year probationary period had not elapsed and there was no other contractual provision granting her tenure. It is true that in Part C it is provided that a faculty member "regardless of length of service may be dismissed because of proved immorality, incompetency, treason or insobriety" and provision is made in Part D for termination of those with continuous employment status or tenure, upon notice stating in what respects his services are unsatisfactory, opportunity to reply and further proceedings. We hold, however, that plaintiff as a probationary employee was not entitled to such protection and was subject to discharge or notice of non-retention or termination without reasons being given.

It will be noted that plaintiff was given notice of non-retention on May 12, 1974, and that her services would be terminated at the end of the academic year 1970–1971, which ended either on June 1, 1971, or September 1, 1971. Whichever is the date, she had more than a year's notice of the decision not to renew her contract.

Further reference should be made to her official appointments as associate professor at Indiana University which are contained in plaintiff's Exhibits 2, 3 and 3A. The evidence as stated, is clear that tenure may only be granted by the President of the University with the approval of the Board of Trustees. In Exhibit 2, her initial appointment, we find that she is only appointed as a member of the Foreign Language Staff for the academic year beginning September 1, 1969, at a salary of $10,720 (this figure was crossed out and the amount of $11,240 inserted in pen and ink apparently as a result of salary adjustment). This appointment notice, which was her initial contract, is signed by defendant Hassler as President of the University and accepted by plaintiff. No reference is contained to any other provisions relative to tenure, class load or assignments. As a matter of fact, the appointment which she accepted provides: "Your duties and hourly semester load will be assigned by the President of the University or his duly appointed representative."

Exhibits 3 and 3A (3A is a copy which did not reproduce the President's signature) are likewise signed by defendant Hassler, as President and contain the same language providing for appointment for the academic year beginning September 1, 1970, at a salary of $11,800.

At the bottom of Exhibit 3 appears this language, inserted by the plaintiff: "I accept this contract with the proviso that my signing of it in no way releases the university from the contractual obligations it assumed at the time of the first contract both verbal and written with Dr. Herbert Isar in February 1969".

It is clear that plaintiff inserted this language on the contract on May 21, 1970, after being notified of her non-retention at the end of the academic year 1970–1971. It will have to be concluded that plaintiff's contention that there were other terms and conditions and that she was to be given tenure are in conflict with these written contracts and hence attempts to vary their terms cannot succeed under the

---

*tionary period of three years unless initially specified otherwise. After the expiration of the probationary period of three years the University must either employ the faculty member on a continuous basis or serve notice that employment will be automatically terminated at the expiration of the fourth year of employment. Should the University wish to terminate probationary employment before the expiration period of three years, the affected faculty member must be notified*

*in writing by the President of such termination no later than December 15 of the contract year of termination. After the three-year probationary period has been passed and the faculty member's services have been judged to be satisfactory, the faculty member is judged to be in continuous employment until the retirement age set by the University or until he resigns or until some pertinent event causes a change in status."*

Pennsylvania Parol Evidence Rule. Gianni v. Russell & Co., 281 Pa. 320, 126 A. 791 (1924). The attempt to vary the terms after she had been notified of her non-retention by inserting the language at the end of Exhibit 3 would in any event be of no effect. The result, if any, would be a proposal from the university and a counter-proposal by the plaintiff which was never accepted by the university and hence no meeting of the minds occurred.

For these reasons, we hold that plaintiff has no contractual rights against the university or any of its officials under Counts 1, 4, 5, 6 and 8 and being a probationary non-tenured employee, was subject to discharge without hearing and without notice of charges, unless as will be discussed later, some element of racial discrimination or restraint on freedom of speech appears in this case which would be the next subject of inquiry under Skehan, supra.

### IV. *Religious Discrimination.*

■ As the findings of fact indicate, plaintiff was absent in September 1969 during which time she was in Philadelphia, alegedly for celebration of her religious holidays. However, the court has determined it a fact that the main reason for her trip to Philadelphia was to keep medical appointments and not for religious holidays. She arranged coverage during this time.

On April 20, 1970, she made a trip to Philadelphia to celebrate Passover. During this time, she arranged coverage but did not arrange for administration of a written examination to her class which was to have been given either on Monday, April 20, or Wednesday, April 22, of that week. The examination was mailed from Philadelphia late one afternoon with the assurance from the post office that it would be delivered in Indiana, Pennsylvania the next day. We find that plaintiff had no justification in relying upon such delivery, since it is well known that the mails from time to time may be subject to unexpected delays. In any event, the examination was not received in time to administer the same to the students.

We do have in the file letters written by the defendant Henninger which indicate bias against the plaintiff which might be considered anti-semitic. However, defendant Henninger was not a member of the Committee on Merit and Tenure which voted not to retain plaintiff and the court determines any anti-semitic bias on her part did not affect the decision for non-retention.

We find no anti-semitic bias on the part of any other members of the Committee on Merit and Tenure, including defendant Faust who presided over the meeting. The hostile letters by defendant Henninger were never sent to plaintiff because Henninger was told not to send them. They did, however, turn up in the Roseman personnel file where they were discovered during the discovery proceedings in this case.

The court concludes that there was no anti-semitic bias present at Indiana University or in any event that plaintiff has not carried her burden of proving by a preponderance of the evidence, that such bias caused her discharge. The court inquired and there was testimony that there were other Jewish members of this faculty; and there is no evidence of any bias against any of them. One of them, as a matter of fact, was on the Committee on Merit and Tenure which voted for plaintiff's non-retention. The biased letters by defendant Henninger were never shown to any potential employer. As a matter of fact, it appears that no potential employer ever made any inquiry relative to plaintiff's record at Indiana University and hence we cannot conclude that plaintiff was stigmatized in any way by this termination.

It should further be considered that there is no requirement in the law that plaintiff be given time off to attend Passover in Philadelphia, Pennsylvania, over 200 miles distant from Indiana, Pennsylvania. She testified she wanted to observe Passover with members of her family, but this appears to be more a matter of personal convenience than of

religious observance. In any event, the university cannot be required to accommodate its scheduling of classes to every possible religious holiday. It is inevitable in any institution such as this that Mohammedans may be required to work on Fridays, that Seventh Day Adventists may have to work on some Saturdays and that Roman Catholics and devout Protestants may be required to work on certain days which are regarded as days for religious observance by them. We therefore find that plaintiff's claim of discharge for reasons of religious discrimination is without merit.

## V. Retaliation for Exercise of Freedom of Speech

■ It will be noted following the directions in Skehan that "if it is found that either termination or non-renewal was because of the exercise of protected speech (as an example) the procedural due process of the decision is irrelevant because the substantive decision is illegal as a matter of Federal Constitutional Law." It was further held that, contract rights aside, the allegation that termination was based on the teacher's exercise of First Amendment rights does not give him a right to a hearing. "Rather, such an allegation of a substantive violation of Federal Constitutional Rights is heard and determined by the court in the first instance."

The evidence in this case discloses that a faculty controversy existed in the Spring of 1970 among the members of the teaching staff of the Foreign Language Department at Indiana University. This seems to have arisen as a result of the receipt or non-receipt of an application by Dr. James Hyde for the position of Chairman of the Foreign Language Department. It appears that a tentative deadline for receipt of such applications had been set for March 31, 1970, and that the application in question was received by the defendant Faust on April 10, 1970. The application, however, appears to have been turned over to the person in charge of these matters for the screening committee, Dr. Op de Beek, and the court finds no improprieties committed by Mr. Faust. Plaintiff never specifically asked Faust about the receipt of the Hyde Application. On April 5, 1970, however, she had complained to Dean McGovern about the situation, claiming that Faust had wrongfully suppressed the application. On May 5, 1970, Dean McGovern, presiding over a meeting of the teaching staff of the Foreign Language Department, reported the fact that serious accusations had been made against the chairman and invited the plaintiff to step forward and explain them. This she did but the faculty nevertheless gave a vote of confidence to Mr. Faust.

On May 12, 1970, the Committee on Merit and Tenure of the Faculty, consisting of those professors having tenure, voted not to renew plaintiff's contract at the close of the academic year 1970–1971. The minutes of this meeting are contained in defendant's Exhibit F. The meeting was held May 12, 1970, and at it the cases of plaintiff and Mr. Parker were discussed at length. At the conclusion of the discussion, the question was put: "Should Roseman's contract be terminated at the end of the 1970–1971 academic year?" The vote was "Yes," ten, "Abstained," one.

Later, on May 12, 1970, Faust wrote a letter to plaintiff (Plaintiff's Exhibit 29) which simply stated that the Committee on Merit and Tenure had voted to recommend that her contract not be renewed at the end of the academic year 1970–1971.

On March 20, 1970, (Plaintiff's Exhibit 38) there had been a previous meeting of this committee to evaluate plaintiff's performance, and in that several shortcomings were noted which were brought to her attention. These furnish work-related reasons for non-retention. It was indicated that the committee would meet again for a further discussion of the non-tenured staff.

The court has been greatly troubled about the issue of freedom of speech in this case, particularly in view of the

close proximity of the meeting of May 12, 1970, to the faculty meeting of May 5, 1970, at which plaintiff had voiced her complaints as to Mr. Faust. Upon a careful review of all the evidence, however, the court holds that there were adequate work-related reasons for not renewing plaintiff's contract.

This being a civil case, plaintiff has the burden of proving by a preponderance of the evidence that her non-retention was caused in substantial part by restraint on her freedom of speech and that this was *protected* free speech. See Skehan, supra.

We have carefully approached the problem in accordance with principles laid down by the United States Supreme Court in Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L. Ed.2d 811 (1968), where the court teaches us that we must balance the teacher's First Amendment rights as a citizen to comment on matters of public interest against the state's interest as an employer in maintaining an efficient administration of its school system. The court stated in Pickering that there was no question of maintaining discipline by immediate superiors or harmony among co-workers. In the instant case, we find that this question does·exist. Further in Pickering the court stated:

> "The statements are in no way directed towards any person with whom appellant would normally be in contact in the course of his daily work as a teacher."

In Jones v. Battles, 315 F.Supp. 601 (D.Conn.1970), a non-tenured probationary teacher brought a civil rights action against a local school board following his dismissal for statements during an open public meeting of the Board in which he labeled the Director of Public Education a liar, and challenged the integrity of the Board's entire administration. The court held that plaintiff's statements were likely to destroy any future amicable relationship between him and the administration staff and that therefore the discharge was proper for the reason that plaintiff had disabled himself from working effectively and harmoniously within the school system.

■ In the instant case, plaintiff's attacks upon Faust's integrity in a faculty meeting would undoubtedly have the effect of interfering with harmonious relationships with plaintiff's superiors and co-workers, and we therefore hold that if plaintiff's remarks in any way contributed to her discharge, they did not constitute protected free speech.

Jones v. Battles, supra, was cited by the district court in Leslie v. Philadelphia 1976 Bicentennial Corporation, 343 F.Supp. 768 (E.D.Pa.1972), aff'd 478 F. 2d 1398 (3d Cir. 1973), where it was held that plaintiff's discharge by defendant State instrumentality was based both upon her unsatisfactory performance of functions and· by utterances accusing the state instrumentality of racist policies. It was held that such statements were destructive of staff morale and made an efficient working relationship impossible.

Again, in Simard v. Board of Education, 473 F.2d 988 (2d Cir. 1973), a non-tenured teacher brought an action when the Board failed to renew his one-year contract. The Second Circuit stated there was ample evidence to support the district court's conclusion that retaliation for union activity was not the cause of the dismissal but that plaintiff's insubordinate remarks to his school principal during an encounter in the principal's office were not protected free speech under Pickering, supra, and that such remarks threatened significant working relationships within the administration of the school.

It is the court's belief that the federal court should not be embroiled in every controversy occurring among university faculties in this district. This court is not a super board of trustees to engage in constant review of all discharges of probationary employees of state college and university faculties. We must further consider that such involvement would lead also to the review of the

non-renewal of all probationary employees in the public school system without tenure. Regardless of these considerations, however, if a preponderance of the evidence shows that the non-retention is based upon a restraint upon a teacher's *protected* freedom of speech, we must not hesitate to act.

After the May 12 letter, the matter then moved on to the university senate, which approved the recommendations of the Committee on Merit and Tenure of the Foreign Language Department, and plaintiff's Exhibit 36 shows the minutes of the trustees, which in December 1970 approved a recommendation by the Dean of Academic Affairs, the Dean of the School of Arts and Sciences, and the Department Chairman involved, together with the recommendations of the university senate committee that the plaintiff be terminated at the close of the then current academic year. The trustees gave the following reasons: "irresponsibility with regard to teaching and advising responsibilities; unauthorized and unwarranted absences from academically scheduled events; is a rebel against any authority; wishes to set her own hours and days; no sense of professional responsibility; abusive to the department chairman." We therefore find that plaintiff was not renewed for these reasons and not for any legitimate exercise of free speech.

The court again wishes to reiterate that in a case such as this, the balance of the public's interest in an efficient administration of its school system versus freedom of speech does not require us to condone accusations of misconduct which jeopardize the harmonious functioning of the system. Unwarranted attacks upon superiors and disturbances of harmony in the administrative and professorial staffs do not require the retention of a teacher or professor under the guise of protection of freedom of speech. Tact and ability to work and cooperate with one's colleagues and ability to impart knowledge of the subject to students are a part of any professor's qualifications or any public school teacher's qualifications and are equally as important as is knowledge of the subject matter. In any organization, it is necessary there be at least some discipline and that the organization not be kept in a turmoil by constant accusations of misconduct by subordinates against superiors.

In any event, the defendants Hassler, McGovern and Henninger had no part in the making of the decision not to renew. While Dr. Isar, who made the original commitments to the plaintiff, was present at the meeting of the Committee on Merit and Tenure and voted for her non-renewal, he and Faust constituted only two out of ten members and therefore it cannot be said that their actions caused her non-retention.

For these reasons, the court determines that the failure to retain Miss Roseman was not based upon any protected exercise of freedom of speech.

VI. *Tortious Interference With Contractual Relations.*

[10–12] Count 7 of the complaint charges that plaintiff's employment was terminated as the result of "malicious interference with a contractual relationship with Indiana University by the individual defendants as set forth above". Inasmuch as we have held that there was no contractual relationship to be protected, this should be sufficient to dispose of this count of the complaint. It may be, however, that this count charges a tortious interference with business relations as described in Restatement of Torts, Section 766, which reads:

"Except as stated in Section 698, one who, without a privilege to do so, induces or otherwise purposely causes *a third person* not to

(a) perform a contract with another, or

(b) enter into or continue a business relation with another

is liable to the other for the harm caused thereby."

It will be noted, however, that this section of the Restatement of Torts which has been adopted by the Pennsylvania Supreme Court as the law of Pennsylvania (See Glenn v. Point Park College, 441 Pa. 474, 272 A.2d 895 (1971) only covers a person who without *privilege* to do so induces or otherwise purposely causes *a third person,* etc. Certainly, communications between subordinate faculty members and the deans and officers and trustees of a university with respect to employment matters of other members of the faculty should be regarded as privileged but, in any event, it has been held that this section of the Restatement was never intended to cover a situation involving an employee and his employer. See decision of this court in Johnson v. University of Pittsburgh (Civil Action 73–120, June 4, 1974). It only applies to attempts to induce *third persons* not to deal. In any event, because there were no contractual relations protected, we will find for the defendants on this count of the complaint.

VII. *Questions of Laches and The Statute of Limitations.*

 Nowhere in the answer is the statute of limitations raised. Under Rule 8(c) the statute of limitations is an affirmative defense to be pleaded in the answer. This was not done. It did not appear in the case until the amended motion for summary judgment was filed July 22, 1974, one week before final non-jury trial. While we recognize that the defense of the statute of limitations does apply to an action for enforcement of civil rights (Ammlung v. Chester, 494 F.2d 811 (3d Cir. 1974), nevertheless since this defense was not pleaded, we refuse to recognize it in this case. It will be noted that we are not considering whether the statute of limitations can be raised on a motion to dismiss because it was not so raised in this case. The pretrial order of May 14, 1974, limited the parties to the issues set forth in the pretrial narrative statements and stipulations filed and nothing in these documents raised the issue of the statute of limitations. In view of our disposition of the case on the merits, however, for the defendants this is a matter of no great moment.

The same is true of the defense of laches. This was raised in paragraph seven of the answer. Defendant now contends that the defense of laches includes the defense of the statute of limitations. In many cases, it is true that laches is often determined by analogy to the applicable statute of limitations. Gruca v. U. S. Steel Corp., 495 F.2d 1252 (3d Cir. 1974). Under the Rules as laid down in Gruca by our circuit and also its decision in Burke v. Gateway Clipper, Inc., 441 F.2d 946 (3d cir. 1971), plaintiff may or may not be guilty of laches. She constantly protested her firing and discharge and the record indicates that she continued protesting while endeavoring to secure counsel. The record further indicates that the defendants and the Commonwealth were aware of her complaints relative to her non-retention and were making attempts to settle the matter by offering her a late hearing following the dismissal on conditions which she and her counsel with some justification found unacceptable. If a due process hearing had been required, one offered after termination is not a proper substitute. Skehan, supra.

We do not, however, have the necessary facts as to prejudice resulting to defendants from plaintiff's delay in bringing her complaints to court to reach a firm determination of this question and such determination is unnecessary in view of the disposition on the merits.

Also in view of the finding for the defendants on the merits, it becomes unnecessary to dispose of the motions for summary judgment but in order to clear the record, they should be treated as pro forma denied.

## CONCLUSIONS OF LAW

1. The court has jurisdiction of the subject matter of this case and of the parties except defendant Indiana Uni-

versity of Pennsylvania which has been dismissed as a defendant.

2. No enforceable contract for continuous employment exists or has existed between the plaintiff and the defendants for employment of the plaintiff as an associate professor or in any other capacity at Indiana University of Pennsylvania beyond the end of the school year 1970–1971.

3. The plaintiff had no property rights in her employment at Indiana University and had no rights to tenure. Without tenure there could be no reasonable objective expectation of continuous employment.

4. Any purported understanding whereby plaintiff was to be employed with tenure or on a permanent basis beyond the end of the school year 1970–1971 is void as being in conflict with Pennsylvania State law and in violation of the Pennsylvania Parol Evidence Rule.

5. The refusal to renew plaintiff's employment beyond the end of the school year 1970–1971 was not caused by religious discrimination as claimed in Count 2 of the complaint.

6. The refusal to renew plaintiff's employment beyond the end of the school year 1970–1971 did not constitute an impermissible restraint upon her freedom of speech.

7. The refusal to renew plaintiff's employment beyond the end of the school year 1970–1971 was caused by valid work related reasons.

8. Since plaintiff had no contractual rights in the continuance of her employment and she was not stigmatized by nonrenewal, she had no right to a hearing upon the refusal to renew her employment beyond the end of the school year 1970–1971.

9. The plaintiff's claims for additional amounts of salary based upon her being placed upon the wrong step in the pay scale and for work requiring in excess of twelve hours per week as set forth in Counts 5 and 6 of the complaint are denied because such pay was not in accordance with the terms of the contract.

10. There was no tortious interference by the defendants with plaintiff's contractual relations or prospects of contractual relations with Indiana University which gave rise to a cause of action under Restatement of Torts, Section 766.

11. Any claims for breach of contract with respect to assignment of courses to the plaintiff as contained in Count 8 should be denied as not in accordance with the terms of her contract and the court finding that there was no binding agreement to the contrary.

12. Defendants' claim of the bar of the statute of limitations should be rejected as not having been properly raised in this case and therefore waived.

13. Judgment should be entered for the defendant upon all counts of the complaint.

14. The plaintiff should pay the costs of this proceeding.

An appropriate judgment order will be entered.