Marie S. WELLS

v.

Donald R. THOMAS, et al.

Civ. A. No. 79-0373.

United States District Court,
E.D. Pennsylvania.

July 21, 1983.

Edward H. Rubenstone and Julie T. Barsel, Goldberg, Barsel & Chambers, Philadelphia, Pa., for plaintiff.

Francis J. Connell, III and Morris R. Brooke, Drinker, Biddle & Reath, Philadelphia, Pa., for defendants.

## MEMORANDUM

GILES, District Judge.

Marie Wells has sued her former employer, the Hospital of the University of Pennsylvania ("HUP"), certain of its management employees, and the University of Pennsylvania ("University") alleging that her employment at HUP was wrongfully terminated on February 3, 1978. Defendants have moved for summary judgment on counts VII, VIII, IX, X and XI, the remaining counts of plaintiff's complaint.[1]

### I. Background

The material facts are undisputed and shall be viewed in the light most favorable to plaintiff. The record shows that Wells began working at HUP in 1952. In 1963 she was promoted to the position of Director of Personnel, a position she held through June, 1976.[2] During her thirteen years in that position, Wells was responsible generally for all personnel related matters at HUP, including grievance handling and employee communications. She was also "a

---

1. A hearing was held August 12, 1982, during which plaintiff withdrew her federal claim asserted in count II under 42 U.S.C. § 1983 in view of the Supreme Court's decisions in *Rendell-Baker v. Kohn*, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982) and *Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), which were dispositive of these claims. By prior stipulation filed on November 26, 1980, count I, insofar as it alleged a deprivation of equal protection, count II insofar as it alleged violations of 42 U.S.C. §§ 1985(3) and 1986, and counts III, IV, V and VI of the amended complaint were dismissed with prejudice.

2. References are to plaintiff's amended complaint filed on February 14, 1979.

member of the policy making body of HUP."

In July, 1976, the University hired defendant Donald R. Thomas into a recently created position, Director of Personnel Management for University Hospitals. Thomas was responsible for personnel management at both HUP and Graduate Hospital, which was then owned and managed by the University.

According to plaintiff, within three months of Thomas' hiring, (1) her title was changed to Director of Manpower Planning, a newly created position with ill-defined responsibilities, (2) defendants falsely told her that other members of the departmental staff had claimed her presence at staff meetings was inhibiting of their volunteering ideas and comments, (3) her private office was taken from her as well as her secretary who was reassigned to another member of the staff, (4) one of her telephone lines was taken without consultation, and (5) she was the only managerial level employee who, when not present, would have phone calls go unanswered.

Plaintiff complained to Thomas about these developments. He responded that under similar circumstances, he and others probably would have left. (Dep. of Wells, May 9, 1979, pp. 65–69). For the first time in her long career at HUP, plaintiff received negative performance evaluations in October of 1976 and June of 1977. Following his preparation of the evaluation form of October, 1976, Thomas wrote in a memorandum to defendant Mark Levitan, HUP's Executive Director, that the changes he intended to implement at HUP, some of which would likely impact on Wells, would be difficult to accomplish but that he was prepared to handle them. In the same memorandum dated November 15, 1976, Thomas indicated that he would, at that time, request Wells to resign or take an early retirement effective June 30, 1977. (Dep. of Thomas, October 28, 1980, pp. 102–107). Plaintiff asserts that, instead, in November of 1976, in consultation with Levitan, and James Heimarck who was employed as staff administrator of HUP,

Thomas apparently took further steps to force her resignation.

By the Fall of 1977, the University had completed the "spin-off" of Graduate Hospital. Thomas' responsibilities became limited to the personnel management function at HUP. As part of a reorganization of the Personnel Department, Thomas decided in late 1977 that the positions occupied by Wells and another employee should be eliminated and submitted a recommendation to Levitan to that effect. In late 1977 or early 1978, Thomas, Levitan and Heimarck discussed Wells' possible termination and concluded that there was no choice but to follow through with Thomas' recommendation. In addition to these discussions, Thomas and Levitan discussed Wells' future at HUP and the University with Gerald Robinson, the University's Executive Director of Personnel Relations. Robinson and his staff considered whether there was a suitable place within the University where Wells could be employed.

On January 31, 1978, Thomas advised Wells that her employment would be terminated effective February 3, 1978 and that the balance of her annual salary for 1978, which was $29,744, would be paid as severance pay. The lump sum payment included all accrued vacation and holiday pay as of February 3, 1978. In addition, Thomas gave Wells the opportunity to remain on the payroll and receive the severance pay in regular bi-weekly or monthly installments thereby entitling her to receive health, life, dental and all other group insurance benefits. Wells declined and elected to accept the lump sum payment. Thomas further agreed that her personnel history records would reflect that termination was caused by a management reorganization which resulted in the elimination of her position.

Following the separation, Wells heard from various persons that she had resigned rather than take another position at HUP or the University. (Dep. of Wells, pp. 103–104). Moreover, plaintiff learned that the private terms of her separation agreement had become common knowledge at HUP. As a result of these discoveries and in order

to have an investigation conducted into the events surrounding her dismissal, Wells sent a letter to Heimarck on February 28, 1978. (Dep. of Wells, pp. 103–106). Based on discussions with Thomas and Levitan, Heimarck stated that he was led to believe that Wells was dismissed as a result of a departmental reorganization and that Thomas and Levitan had done all that was possible to place her in another position at the Hospital or in the University. When questioned by Dr. Kyle, then Chairman of the HUP Medical Board, who was concerned that Wells be given all possible help as a long term employee, Heimarck indicated that such help was being given. (Dep. of Heimarck, July 11, 1979, pp. 97–99). In fact, plaintiff was not placed in an alternate job by Heimarck, Thomas or Levitan. Had another position been offered, she would have accepted it rather than resign. (Dep. of Wells, May 9, 1979, p. 126). Plaintiff contends that she was terminated on the pretext that she failed to perform her duties as required and in a reasonably satisfactory manner. In her opinion, outright dismissal was resorted to only after a premeditated plan calculated to force her into retirement proved unsuccessful.

Plaintiff asserts that in order to conceal the unjustified and arbitrary dismissal, requisite procedural safeguards at both HUP and the University were ignored. There had been in effect at HUP since at least January 1, 1977, a collection of personnel policies addressing many aspects of employment, benefits and employee relations. Included among these policies was "Guidelines for Cooperation and Discipline Policy and Procedure," ("Discipline Policy") which set forth the disciplinary procedures for terminating a HUP employee for cause. In pertinent part, the Discipline Policy provided that no HUP employee would be discharged from staff without a full hearing and that a disciplinary hearing must be conducted by the Director of Personnel Management or his designee. A second HUP policy, "Employee Concerns and Communications Policy and Procedure," ("Communications Policy") provided an appeal and review procedure. This was an in-house grievance procedure

for employees dissatisfied with their treatment by HUP. It had a four step system culminating in "final review" of the grievance by the Administrator of the Hospital. Wells concedes that this policy is inapplicable to a termination for cause and that, in fact, HUP had no appellate grievance procedure available to employees discharged for cause.

The Personnel Policy Manual of the University contained a Termination Policy (Policy No. 701) that provided, in relevant part, as follows:

No University employee may be involuntarily terminated for any reason without prior review of the action by an officer of the Personnel Relations Department. No employee with fifteen or more years of University service may be involuntarily terminated for any reason except with the express prior approval of the President or the Provost or the appropriate Vice President upon the recommendation of the Executive Director of Personnel Relations.

The "Layoff and Severance Arrangements Policy" (Policy No. 704) in effect at the University at the time of Wells' termination provided as follows:

The guiding principal is that the employee with the least amount of University service is normally laid off first. A departure from the length of service principal may be appealed by the employee through the grievance procedure.

\* \* \* \* \* \*

The Personnel Relations Staff will make every effort to find alternate placement within the University for individuals being laid off. Every member of the University's academic and administrative staff has a responsibility for cooperation in this effort. Whenever possible, staffing of new positions and filling of vacancies should be accomplished through internal transfer on a University-wide basis.

The termination policies of the University were not set forth or referred to in any

personnel policy manual of HUP.[3] Wells was not specifically and expressly offered the opportunity of a pre-termination hearing pursuant to HUP's Termination Policy. Nor was HUP's Communications Policy followed. Additionally, plaintiff claims that University Policy Nos. 701 and 704 were not followed prior to her termination.

In addition to the written policies of HUP and the University, a number of unwritten policies arguably existed. Specifically, in his deposition Thomas indicates that it was common practice for HUP to place individuals, whose HUP job had been eliminated, in alternate positions at the University as was done when the hospital closed its School of Nursing. (Dep. of Thomas, Aug. 2, 1979, p. 63; Aug. 3, 1979, p. 43; Dep. of Wells, p. 135). Plaintiff alleges there was a long-standing policy of both the University and HUP that employees who performed their job efficiently would always have a job, even if not their present position, and that this policy was publicized in all of HUP's major personnel publications. (Dep. of Thomas, Aug. 3, 1979, pp. 46–49, 94). Plaintiff asserts that HUP made this job security policy a focal point in its efforts to defeat a number of union organizing campaigns. (Dep. of Heimarck, July 11, 1979, pp. 30–33, 79 and 88; Dep. of Wells, p. 42).

## II. *Discussion*

### A. *Breach of Contract Claim*

In count VII of the amended complaint, plaintiff alleges that defendants breached an employment contract with her by failing to follow the termination policy of the University as well as those procedures followed by HUP with respect to termination, transfer and salary increases. Plaintiff does not dispute that under Pennsylvania law, absent an express statutory or contractual provision to the contrary, an employment contract is terminable at will. Rather, plaintiff argues that if the agreement were

originally one at will, the actions and intentions of the parties have modified it, rendering it an implied contract as of the time of her termination.

For purposes of this motion only, defendants do not contend that they adhered to their practices and policies, but argue that no contract, express or implied, existed. Defendants argue that plaintiff did not rely upon the University's policies and, therefore, that they should not be regarded as part of the consideration for her work at HUP. In particular, defendants point to plaintiff's deposition testimony where, when asked whether her termination violated any University policies, she responded, "I was aware of the existence of the University policy, but I did not know whether it applied to me." (Dep. of Wells, p. 106). Plaintiff further stated that prior to, and at the time of her termination, she was not advised of any rights which she had within the University structure to protect her or otherwise obtain a review of her termination. (*Id.* pp. 133–34).

From these admissions I conclude that there is insufficient evidence to create a jury question regarding the parties' intent to form an implied contract based upon the written and unwritten policies of HUP and the University. *Compare Wagner v. Sperry Univac, Div. of Sperry Rand Corp.,* 458 F.Supp. 505 (E.D.Pa.1978), *aff'd,* 624 F.2d 1092 (3d Cir.1980) (evidence sufficient to preclude entry of summary judgment on plaintiff's claim for breach of employment contract). Courts have been reticent to allow claims for breach of implied contract where an employee at will relies on personnel policies. *See, e.g., Beidler v. W.R. Grace, Inc.,* 461 F.Supp. 1013 (E.D.Pa.1978), *aff'd,* 609 F.2d 500 (3d Cir.1979); *O'Neill v. ARA Services, Inc.,* 457 F.Supp. 182 (E.D. Pa.1978). Plaintiff relies on *Skehan v.*

**3.** *HUP's Relationship to the University.* HUP has no corporate existence separate from that of the University. However, the management of the Hospital has been delegated by the University Trustees to a "Trustee Board" of the Hospital. The Trustee Board has its own set of by-laws which establishes its authority as the managing authority of HUP. (Levitan dep. p. 9). HUP is directly managed by the defendant Levitan, HUP's Executive Director. Levitan has direct responsibility for all management functions at HUP, including the personnel management function.

Board of Trustees of Bloomsburg State Col., 590 F.2d 470 (3d Cir.1978), cert. denied, 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 41 (1979) (non-tenured teacher discharged in violation of procedures governing discharge), to argue that personnel policies of HUP and the University created a contractual right supported by consideration. However, in Skehan, the district court found that the policy in question had been adopted not only to insure more effective services by faculty members at the start of a term of employment, but that each faculty member was given a copy of the policy and had to acknowledge in writing familiarity with its provisions. See 590 F.2d at 483. "Thus, the court found the [policy] to be an integral part of the contractual structure defining the employment relationship between the College and its faculty." Id. Here, the policies cannot be considered integral to plaintiff's employment. Wells' own deposition testimony demonstrates that she did not rely upon the University's policies in accepting employment. Plaintiff's expectations, formed during the course of her employment, that she was or might be protected by certain written and unwritten policies, do not rise to the level of a contract. Plaintiff did not believe that HUP's Communications Policy was applicable to her situation (Wells dep., p. 133), and she has made no showing here whether and to what extent she actually relied upon HUP's Discipline Policy.[4] By contrast, the policy relied upon in Skehan, was clearly applicable to the plaintiff and at the initiation of his contract, was incorporated as a condition of his employment with the school.

 Since the court finds that neither the University nor HUP personnel policies created an implied, unambiguous employment contract, plaintiff remained an employee at will whose relationship at HUP was terminable at any time by either party. Bruffett v. Warner Communications, 692 F.2d 910 (3d Cir.1982); O'Neill v. ARA Services, Inc., 457 F.Supp. at 185 (contract

of employment which does not specify definite duration presumed to be terminable at will by either party); Green v. Medford Knitwear Mills, Inc., 408 F.Supp. 577, 579 (E.D.Pa.1976); Geib v. Alan Wood Steel Co., 419 F.Supp. 1205, 1207 (E.D.Pa.1976); Keddie v. Pennsylvania State University, 412 F.Supp. 1264, 1278 (M.D.Pa.1976). The exception to this general rule requires that the discharge violate a "clear mandate of public policy." Geary v. United States Steel Corp., 456 Pa. 171, 184–85, 319 A.2d 174, 180 (1974). Plaintiff has not attempted, nor does the court find from the allegations in the complaint, that defendants' actions in discharging plaintiff violated public policy. See Beidler, 461 F.Supp. at 1015–16 (no public policy violation and hence no cause of action for wrongful discharge where company failed to adhere to its own stated guidelines in discharging employee). See generally Harrison v. James, P.A., Inc., 558 F.Supp. 438 (E.D.Pa.1983).

Although recently the strict common law doctrine of at-will employment has come under attack, Davis v. United Supply, 581 F.2d 335, 340 (3d Cir.1978); see Weiner v. McGraw Hill, Inc., 57 N.Y.2d 458, 443 N.E.2d 441, 457 N.Y.S.2d 193 (N.Y.1982); see generally Peirce, Mann, Roberts, Employee Termination at Will: A Principled Approach, 28 Vill.L.Rev. 1 (1982); Comment, The Employment-at-Will Rule: The Development of Exceptions and Pennsylvania's Response, 21 Duquesne L.Rev. 477 (1983), Pennsylvania has neither recognized nor advanced the principles asserted by these challenges to the traditional doctrine. Compare Murphy v. American Home Products, 461 N.Y.S.2d 232, 448 N.E.2d 86, 58 N.Y.2d 293 (N.Y.1983) (at-will employees discharged in bad faith do not have cause of action against employer for breach of contract).

For these reasons, defendants' motion for summary judgment on count VII of the amended complaint will be granted.

---

4. Wells testified that the Discipline Policy was not applicable to involuntary terminations for reasons other than misconduct or poor per-

formance, (Id., p. 11). Nor was plaintiff aware of which Discipline Policy was in effect in January, 1978. (Id.)

### B. Intentional Infliction of Emotional Distress

■ Count VIII of the amended complaint asserts that the conduct of the defendants vis-a-vis the plaintiff constituted "outrageous conduct and an intentional infliction of emotional distress upon plaintiff." It is the duty of the court to determine, in the first instance, whether the defendants' conduct could reasonably be regarded as so extreme and outrageous as to permit recovery. *Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265, 1273–74 (3d Cir.1979); *Jones v. Nissenbaum, Rudolph & Seidner,* 244 Pa.Super. 377, 385, 368 A.2d 770, 774 (1976); Restatement (Second) of Torts § 46, comment (h) (1965). As a basis for her claim, plaintiff avers that defendants, without cause, stripped her of her position as Personnel Director at HUP and placed her in a newly created position without responsibilities. They took away plaintiff's private office and had her working in a "corral space." Her secretary was reassigned to someone who had previously reported to Wells and a line was removed from plaintiff's phone without prior consultation. Wells was the only managerial level employee who, if she was away from her desk, would have her phone calls go unanswered. Additionally, Thomas gave plaintiff poor performance evaluations on two occasions, the first time she was rated below excellent in 25 years. Failure to give Wells an annual salary increase in 1977 and her final termination have also been pleaded in support of this claim.

■ This conduct, though intentional and perhaps highly inappropriate in view of plaintiff's long work history at the hospital, is not the type of extreme and outrageous conduct which Pennsylvania courts have recognized as giving rise to a cause of action. In *Beidler v. W.R. Grace,* 461 F.Supp. 1013 (E.D.Pa.1978), for example, the plaintiff alleged that he had been excluded from meetings necessary to perform his job, found papers constantly rearranged on his desk so as to annoy him, was informed he would be given a new "assistant" without first being consulted or informed of any plans for the assistant, learned from rumors that his job was in jeopardy, and was evaded by his superior who intimated that the new assistant would be replacing the plaintiff. 461 F.Supp. at 1016. The court denied plaintiff's claim for intentional infliction of emotional distress. Wells' assertion that each act of the defendants is "demonstrative of pattern of premeditated behavior calculated to put [p]laintiff under such emotional strain and distress that she would be forced to quit," does not alter this court's conclusion that no cause of action is stated. Comment (d) to Restatement (Second) of Torts § 46, provides in pertinent part:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice, or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community . . . .

Viewed against this standard, the conduct complained of by Wells is not so extreme and outrageous so as to support an action for intentional infliction of emotional distress. *Cf. Chuy* (team doctor told reporter that member of football team suffered from potentially fatal blood disorder though knowing it to be untrue); *Papieves v. Kelly,* 437 Pa. 373, 263 A.2d 118 (1970) (hit and run driver, without attempting to obtain medical assistance and without notifying police or parents, removed boy's body from scene of accident and buried it in field); *Jones v. Nissenbaum,* 244 Pa.Super. 377, 368 A.2d 770 (1976) (no claim found where creditor, knowing execution proceedings on house could not be completed, sent threatening letter, and in presence of neighbor told plaintiffs their house would be sold and that "they would have 30 days . . . to get their junk out"). *Compare Martin v. Municipal Publications,* 510 F.Supp. 255, 260

(E.D.Pa.1981) (sufficient evidence from which jury reasonably could find that publication of plaintiff's photograph with caption referring to closet transvestites who get stinking drunk, constituted extreme and outrageous conduct); *Shaffer v. National Can Corp.,* 565 F.Supp. 909 (1983) (plaintiff's claim for intentional infliction of emotional distress based on continued course of sexual advances, followed by refusals and ultimately retaliation, survived motion to dismiss).

▮ The conclusion that no claim lies for intentional infliction of emotional distress is supported by plaintiff's failure to allege that she suffered "severe" emotional distress.[5] Paragraph 68 in count VIII states, "Actions of defendants . . . caused plaintiff to suffer humiliation, depression, and mental distress through the time of filing this action." Comment (j) to the Restatement (Second) of Torts § 46 provides:

> The rules stated in this Section apply only where the emotional distress has in fact resulted, and where it is severe . . . It is where it is extreme that the liability arises. . . . The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it. The intensity and the duration of the distress are factors to be considered in determining its severity . . . .

Wells' deposition testimony indicates that shortly after her departure from HUP her blood pressure may have increased. This does not amount to an indication of "severe" emotional distress and plaintiff has neither alleged it nor supported it with deposition testimony.

For the foregoing reasons, defendants' motion for summary judgment on count VIII of plaintiff's amended complaint will be granted.

C. *Conspiracy to Injure Prospective Contractual Relations and Tortious Interference With Existing Contractual Relations*

Relying upon Restatement of Torts § 766 (1939), plaintiff has made a claim in counts IX and X for conspiracy to injure her prospective contractual relations and for tortious interference with existing contractual relations.[6] Section 766 was adopted by Pennsylvania in *Glenn v. Point Park College,* 441 Pa. 474, 272 A.2d 895 (1971). It provides:

> Except as stated in section 698, one who, *without a privilege* to do so, induces or otherwise purposely *causes a third person* not to
>
> (a) perform a contract with another, or
>
> (b) enter into or continue a business relation with another
>
> is liable to the other for the harm caused thereby. (emphasis added).[7]

▮ Two prerequisites to liability under § 766 are the absence of a *privilege* and action by a *third person.*[8] *See Roseman v.*

---

**5.** The tort involves four elements: (1) the conduct must be extreme and outrageous and (2) intentional or reckless; (3) it must cause emotional distress and (4) the distress must be severe. *Martin* 510 F.Supp. at 258 (E.D.Pa. 1981). Plaintiff's count fails on at least the first and fourth elements.

**6.** Plaintiff combines the discussion of these two counts in her answer to the motion for summary judgment. For the most part, they are repetitious of allegations for breach of contract contained in count VII. To the extent these counts represent additional claims, they will be treated together.

**7.** For purposes of this motion, plaintiff asks the court to accept as true her assertion that a contract of employment did exist embodying the policies discussed above. However, courts

of Pennsylvania have held that employers and employees are entitled to be free from meddling by third parties, even where there is no contract and the employment is at will. *Geary v. United States Steel Corporation; Dorrington v. Manning,* 135 Pa.Super. 194, 4 A.2d 886 (1939); *Padden v. Local 90 United Ass'n of Journeymen Plumbers,* 168 Pa.Super. 611, 82 A.2d 327 (1951). *Roseman v. Hassler,* 382 F.Supp. 1328. *See also* § 766, comment (g), Restatement (Second) of Torts (1979).

**8.** *Compare* Restatement (Second) of Torts § 766B (1979), *construed in Zions v. United Health Club,* 704 F.2d 120, 125 (3d Cir.1983) (charge of interference with a prospective business relationship requires proof of: (1) a prospective contractual relationship; (2) a purpose or intent to harm the plaintiff by preventing the relationship from occurring; (3) the absence of

*Hassler,* 382 F.Supp. 1328, 1341 (W.D.Pa. 1974), *aff'd sub nom. Roseman v. Indiana University,* 520 F.2d 1364 (3d Cir.1974), *cert. denied,* 424 U.S. 921, 96 S.Ct. 1128, 47 L.Ed.2d 329 (1976). In *Roseman,* an action in which a non-tenured professor was "non-renewed," the court reasoned that communications between subordinate faculty members and the deans, officers and trustees of the university regarding employment matters of other members of the faculty, should certainly be regarded as privileged. 382 F.Supp. at 1341. Similarly, as supervisors of plaintiff, defendants were privileged when they evaluated her performance, discussed among themselves her position at HUP and in the University, and passed their evaluation onto their superiors.[9]

Even if defendants had no privilege, plaintiff's claim for tortious interference would fail since there is no third person involved who induced the breach. More specifically, Pennsylvania law does not permit a terminated employee to assert against his or her employer a claim for intentional interference with his employment relationship; it is not a claim which can be made by the parties to a "contract" against each other. *Fincke v. Phoenix Mutual Life Ins. Co.,* 448 F.Supp. 187, 190 (W.D.Pa.1978), ("[n]o person or company can be guilty of 'inducing' himself or itself to breach his or its own contract,"); *George A. Davis, Inc. v. Camp Trails Co.,* 447 F.Supp. 1304 (E.D.Pa. 1976) quoting *Allison v. American Airlines, Inc.,* 112 F.Supp. 37, 39 (N.D.Okla.1953).[10] In *Menefee v. CBS, Inc.,* 458 Pa. 46, 56, 329 A.2d 216, 221 (1974), a terminated radio personality sued his employer and supervisors for conspiring to secure his termination in order to maliciously and unlawfully injure him. The court stated:

> the trial court was correct in its decision to dismiss that cause of action insofar as it named CBS, Inc., Downey and Grant as defendants. CBS, Inc., the other party to the contract, had the right to terminate the contract on thirteen weeks' notice. Downey and Grant, as employees of the radio station with a privilege to advise the station on handling its employees, were privileged to cause the station to terminate the contract. See § 722 of the Restatement of Torts. [Privilege to Advise].

When the individual defendants allegedly engaged in tortious interference with Wells' business relationship with the University and HUP, they were managerial employees acting in their official capacities. Accordingly, no "third party" can be said to have interfered with Wells' relationship to her former employer.

Plaintiff also asserts a conspiracy theory relying on § 762(c) of the Restatement of Torts (1939) which provides:

> One who causes intended or unintended harm to another merely by refusing to enter into a business relation with the other or to continue a business relation terminable at will is not liable for that harm *if the refusal is not . . .* (c) *part of a concerted refusal by a combination of persons of which he is a member.* (emphasis added).

Though this rule applies to refusals between employer and employee, *Geary v. United States Steel Corp.,* 456 Pa. 171, 176

---

privilege or justification; and (4) actual damage resulting from defendant's conduct).

**9.** Plaintiff reliance on comment (d) of § 769 to allege that the privilege exception to § 766 does not apply to claims for breach of contract is misplaced. Comment (d) is an exception to the specific privilege provided in § 769 which is inapplicable here, and is not an exception to the general privilege provided by § 766. To the extent plaintiff relies on *Geib v. Alan Wood Steel Co.,* 419 F.Supp. 1205, 1209 (E.D.Pa. 1976), to support her position, such reliance is misplaced for the same reason.

**10.** *Compare Harrison v. American Federation of Labor,* 452 F.Supp. 102 (E.D.Pa.1978) (court, seeking appropriate analogy, concluded that interference with business relations was most appropriate even though the interference alleged was by party to the disrupted relationship with the plaintiff; court recognized this factor might place case beyond realm of tort law but question at issue was not whether plaintiff's allegations were actionable under state law).

n. 5, 319 A.2d 174, 176 n. 5 (1974), it is inapplicable here since the "combination of persons" who would have conspired to interfere with plaintiff's existing or prospective business relationships were all employees of HUP. As such, defendants are "agents of a single corporation" who cannot conspire among themselves. *Cf. Johnson v. University of Pittsburgh,* 435 F.Supp. 1328, 1370 (W.D.Pa.1977) (conspiracy among agents of a single entity, *i.e.,* the University of Pittsburgh, not sufficient to support a cause of action under § 1985(3) since agents of a single corporation cannot conspire among themselves); *Keddie v. Pennsylvania State University,* 412 F.Supp. 1264, 1276 (M.D.Pa. 1976) (in action by nontenured professor against the University, its president, the dean of Liberal Arts College and five members of faculty committee, court dismissed claim for conspiracy under § 1985(3) reasoning that challenged conduct was essentially act of single entity; "A university cannot conspire with itself any more than a person or corporation can.").[11]

Even if it could be said that defendants were stripped of a privilege because they interfered with plaintiff's existing or prospective business relationships, the court finds this claim redundant of plaintiff's breach of contract claim in count VII.[12] *See Keddie,* 412 F.Supp. at 1278. Furthermore, any possible claim that defendants sought to injure plaintiff's chances for future employment are contradicted in large degree by Wells' deposition testimony in which she admitted that Thomas had offered to have her record reflect a voluntary resignation to do consulting work. (Dep. of Wells, p. 99).

For these reasons, summary judgment will be granted on counts IX and X.

### D. *Invasion of Privacy*

■ Count XI of plaintiff's amended complaint alleges a claim for invasion of privacy, or more specifically, the tort of publicity given to private life. Pennsylvania has adopted the Restatement (Second) of Torts, Section 652D (Tent.Draft No. 13, 1967), *Vogel v. W.T. Grant Co.,* 458 Pa. 124, 327 A.2d 133 (1974), which provides:

> One who gives publicity to matters concerning the private life of another, of a kind highly offensive to a reasonable [person], is subject to liability to the other for invasion of his privacy.[13]

The three elements of this tort are: (1) publicity (2) which is unreasonable and (3) is given to a private fact. *See Vogel,* 458 Pa. at 131, 327 A.2d at 136; *Barr v. Arco Chemical,* 529 F.Supp. 1277, 1280 (S.D.Texas 1977) (applying Pennsylvania law).

" 'Publicity' means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge .... The difference is not one of the means of communication ... [but] one of a

---

**11.** The conclusion is supported by *Geary* wherein plaintiff sued U.S. Steel upon dismissal after fourteen years of service due to a disagreement stemming from one of the company's products. Referring to § 762, the court stated: "At the risk of belaboring the obvious, we note that none of the enumerated exceptions applies to appellant." 456 Pa. at 176 n. 5, 319 A.2d at 176 n. 5.

**12.** *See* n. 6 *supra.*

**13.** The Restatement (Second) of Torts (1977) §§ 652B–E identifies four categories of invasion of privacy: intrusion upon seclusion, appropriation of name or likeness, publicity given to private life and publicity placing person in false light. *Barr v. Arco Chemical Corp.,* 529 F.Supp. 1277, 1280 n. 4 (S.D.Texas 1982). Paragraph 79 of the amended complaint reads:

"At no time did defendants have authorization or consent to make public the financial circumstances attending plaintiff's termination from HUP." These allegations squarely place plaintiff's claim in count XI within the ambit of § 652D. When *Vogel* was decided, a fifth category existed in § 867 of the Restatement entitled "Interference with Privacy." It provided: "A person who unreasonably and seriously interferes with another's interest in not having his affairs known to others or his likeness exhibited to the public is liable to the other." *Vogel,* 458 Pa. at n. 19, 327 A.2d at n. 9. *Vogel* did not specifically address or adopt § 867. It also has been omitted from the 1977 edition of the Restatement and incorporated into §§ 652A–I, indicating that it may have been considered redundant of those causes of action. Therefore, to the extent plaintiff separately relies on § 867, it is unpersuasive.

communication that reaches, or is sure to reach the public." Restatement (Second) of Torts, § 652D, comment (a) (1977). *See also Vogel,* 458 Pa. at 131–32, 327 A.2d at 137.

Plaintiff alleges that one individual at HUP was informed of the terms of her separation agreement at a meeting of hospital staff members, while another person was informed by one of the named defendants personally. Therefore, it is alleged that the private facts became common knowledge at HUP. These facts, viewed in the light most favorable to the plaintiff, do not constitute the requisite level of "publicity" required to state a valid claim. Publication to the community of employees at staff meetings and discussions between defendants and other employees is clearly different from the type of *public* disclosure found in cases relied upon by plaintiff. *Compare Biederman's of Springfield, Inc. v. Wright,* 322 S.W.2d 892 (Mo.1959) (loud declarations of indebtedness in a public restaurant); *Housh v. Peth,* 99 Ohio App. 485, 135 N.E.2d 440, *aff'd,* 165 Ohio St. 35, 133 N.E.2d 340 (1956) (creditor's systematic campaign to harass debtor included calling plaintiff out of the classroom three times within fifteen minutes and making numerous telephone calls over three week period to plaintiff and her supervisors); *see also, Brents v. Morgan,* 221 Ky. 765, 299 S.W. 967 (1927) (automobile repairman placed large notice in show window of garage calling attention to customer's overdue account). *Compare Vogel* (four persons, three relatives and one employer, contacted in connection with debtor's account, did not constitute publication).

In *Rogers v. International Bus. Machines Corp.,* 500 F.Supp. 867 (W.D.Pa. 1980), an employee discharged after fourteen years of service brought an action claiming, *inter alia,* invasion of privacy under § 652D. The court granted summary judgment to the defendant reasoning that "[the] information was conveyed only to employees of IBM with a duty, responsibility and a need for such information in order to properly address the concerns of subordinate employees. To suggest that such discussions constitute publication is contrary to the holding in *Vogel* .... Without proof of publication, the claim for invasion of privacy must fail." 500 F.Supp. at 870. Although there may have been neither a duty nor a responsibility of the HUP employees to hear the terms of plaintiff's separation agreement, her absence and the reasons for her absence was clearly information which they would want, or feel a need, to know. Imparting this information at a staff meeting or in response to individual questions by employees would be appropriate and would not constitute publication. Plaintiff's assertion that disclosures to the employees constituted publication to "almost the entire universe of those who might have some awareness or interests in such facts," even if assumed to be true, would not constitute "publicity" but a mere spreading of the word by interested persons in the same way rumors are spread.

Plaintiff's claim also fails because the alleged disclosures are not the kind which are outrageous or highly offensive to the ordinary reasonable person. Plaintiff alleges that the terms of her separation agreement, *i.e.,* that she received a lump sum separation payment of eleven months of her salary and that she resigned rather than accept a lower level position, are hardly matters by which a reasonable person would feel justifiably and seriously aggrieved, even if untrue.[14]

Assuming, arguendo, there were publicity which was unreasonable, it still must be found that the facts were private. Plaintiff contends throughout her complaint that the policies of HUP and the University were not followed. Without belaboring the point, had plaintiff received what she contends she was entitled to, then

**14.** Plaintiff's attempt to argue that it is the publicity given, and not the nature of the facts disclosed, which must be unreasonable, is incorrect. The tort requires that the publicity concern private facts of a kind that are highly offensive to a reasonable person. *See* § 652D, comment (c) Restatement (Second) of Torts (1977).

the facts of her potential termination, as well as her negative evaluation reports and other items of her employment history at HUP, would have presumably been disclosed to at least the same extent as they were allegedly disclosed by the defendants. HUP's Discipline Policy provides: "No employee will be discharged from staff without a full hearing . . . ." *Id.* Para. 3. "The persons present at a disciplinary hearing may include: Employee(s), Supervisor of employee, and/or Department Head, Administrative representative, and the Director of Personnel Management, or designee, as the Hearing Officer. All pertinent factual data and/or testimony will be considered at the hearing and a final decision rendered within five (5) working days after the hearing." *Id.* Para. 5. "An employee will be permitted to have other hospital employees or persons approved present at the hearing to give factual data." *Id.* Para. 6. Confidentiality is not guaranteed by this written policy nor by University policies 701 and 704 by which plaintiff also claims relief. Moreover, any legitimate inquiry made of the University or HUP regarding plaintiff's employment record by potential future employers would have revealed what was reflected therein. Thus, the facts were not private contrary to plaintiff's assertion.[15]

Thus, the court has found that there was no publicity of the facts alleged and, further, that even if there had been, it was not unreasonable nor given to private facts. Accordingly, the motion for summary judgment on count XI of the amended complaint will be granted.

---

**15.** Comment (a) of the Restatement (Second) of Torts (1977), puts this into a proper perspective. "Every individual," it explains,

has some phases of his life and his activities and some facts about himself that he does not expose to the public eye, . . . . Sexual relations, for example, are normally entirely private matters, as are family quarrels, many unpleasant or disgraceful or humiliating ill-

nesses, most intimate personal letters, most details of a man's life in his home, and some of his past history that he would rather forget. When these intimate details of his life are spread before the public gaze in a manner highly offensive to the ordinary reasonable man, there is an actionable invasion of his privacy, unless the matter is one of legitimate public interest.